[Crim. No. 4883.   Second Dist., Div. Three.   May 15, 1953.]

THE PEOPLE, Respondent, v. WARD DAN NEFF, Appellant.

C. Ransom Samuelson and Simpson & Wise for Appellant.

Edmund G. Brown, Attorney General, and Norman H. Sokolow, Deputy Attorney General, for Respondent.

WOOD (Parker), J.—Defendant was charged in two counts with the crime of manslaughter, in that, on January 12, 1952, he unlawfully and without malice killed two persons. The deaths resulted from carbon monoxide poisoning, which was caused by fumes from a gas heater in a hotel where defendant was employed as manager. In a trial by jury, he was found guilty as charged in each count. His motion for a new trial was denied. Imposition of sentence was suspended, and probation was granted upon the condition that he serve six months in the county jail. He appeals from the order denying his motion for a new trial and from the judgment.

(An order granting probation is a final judgment. Pen. Code, § 1237, subd. 1.)

Appellant contends that the judgment is contrary to law, and that the court erred in instructing the jury.

On January 1, 1950, the Farmers and Merchants Bank and Mr. and Mrs. D. S. Snyder entered into a written lease agreement whereby the bank leased the Grant Hotel in Long Beach to Mr. and Mrs. Snyder. During said month the Snyders employed defendant, their son-in-law, as manager of the hotel. From that time to the time of trial, defendant continued to work in that capacity. Mrs. Snyder died on November 26, 1951. Thereafter, Mr. Snyder lived at the hotel part of the time, and was living there in January, 1952.

On January 11, 1952, Ronald Wallace, Jr., and Wanda Wallace, husband and wife, registered at the hotel and occupied room 12. On January 12th, about noon, a maid entered the room and found that Mr. and Mrs. Wallace were dead. They were on a bed, and, according to the maid's testimony, the gas radiator was burning ''full blast.''

Room 12 was approximately 12 feet long and 11 feet wide. The door of the room was in the west wall, and there was a double window in the east wall and a double window in the north wall. Inside the room there were two beds, a dresser, a small table, a washbasin and the gas radiator. The bed on which Mr. and Mrs. Wallace were lying was near the door. The gas radiator was connected to a gas supply pipe which extended from the south wall. In the said wall, by the gas pipe, and about 18 inches above the floor, there was a circular opening into a rectangular cement vent or flue within the wall. Said vent or flue extended from said circular opening to the roof and its inside dimensions were 2 inches by 4 inches. A police officer, who made a drawing of the floor plan of the room (People's Exhibit 1), testified that, according to marks on the floor which could have been made by that radiator, the radiator was about 3 feet from the bed on which Mr. and Mrs. Wallace were found, and the back of the radiator was about 6 inches from the south wall. Said radiator was approximately 30 years old and was manufactured by the Pacific Gas Steam Radiator Company. In the top of the radiator there were two holes, each being one-half inch in diameter, which apparently had been drilled after the radiator was purchased. In the back of the radiator there was a vent outlet. The outlet, which was below the level of the burner, had been enlarged from its

original size. Between the radiator and the south wall there was a vent pipe, one end of which was inserted into the opening in the wall and connected with the cement vent within the wall. The other end of the vent pipe fitted loosely into the vent outlet of the radiator—leaving a space between the pipe and "the outside diameter of the hole."

The maid, called as a witness by the People, testified that when she opened the door of the room the fumes rushed at her, and the flame was coming out from under the open heater; she went to the radiator, turned the gas off, and observed that the vent pipe was out of the radiator and lying on the floor; the other end of the vent pipe was in the (wall) socket; she then left the room, saw defendant in the hall and told him there were two bodies on the bed and for him to "Take over"; defendant and his wife walked into the room and closed the door—this was about 12:15 p. m.; they stayed in there for "a while"; she (witness) stood there five seconds and then went upstairs to work; thereafter the defendant came to the witness and told her to practically close her eyes to what she had seen and to keep her mouth shut— that he would take care of what had happened; about 3 p. m., she entered room 12 again and observed that the pipe was "shoved into the radiator." She testified further that on two occasions prior to the deaths of Mr. and Mrs. Wallace she had called defendant's attention to the vent pipe because she had observed the pipe on the floor like she found it on the 12th, and defendant told her that he would take care of it; the first time she told defendant about the vent pipe was in the fall (1951), when she had moved an occupant of room 12 to another room; defendant asked her why she moved the occupant from room 12, and she told him that the occupant had objected to gas fumes; she told defendant "that gas is leaking in that heater," and it is time that he "took care of that before some danger comes to someone"; the second time she mentioned the vent pipe to defendant was about five days before the deaths of Mr. and Mrs. Wallace, at which time she told defendant, "You haven't fixed that vent pipe into that radiator as yet. Do something about it before some danger will come to someone." On cross-examination, counsel for defendant read testimony of the witness, from the transcript of the preliminary examination, to the effect that she saw the vent pipe out of the radiator on January 11th and she did not attempt to put it back and she did not tell the defendant about it; and that she did not

see the pipe out of the radiator the week before January 12th. She testified further that she commenced work at the hotel in August, 1951; when she observed anything that needed repair she reported it to defendant and he would have the condition remedied; during the time she worked there, she and defendant quarreled frequently; she quit while she was angry with him, after a quarrel at which time defendant said something about a clock that had disappeared from a tenant's room; the reason she became angry on that occasion was that he was always after her—it was not about the clock, but "about this case."

The superintendent of distribution for the gas department of the city of Long Beach, called as a witness by the People, testified that on January 16th he went to the hotel; he went into room 12 and ascertained the size of the orifice in the radiator (size No. 51); it would permit 18 to 20 cubic feet of gas per hour to go through the valve; in his opinion that size heater is not capable of burning that much gas properly; the product of incomplete combustion is carbon monoxide.

Another employee of that gas department, called as a witness by the People, testified that he was a "trouble shooter" for the department and had worked there about 31 years; he had become familiar with various types of gas heating equipment; on January 16th he went to room 12 to connect the heater; he noticed that the part of the vent which goes into the heater was very loose and barely inserted into the heater; when he lighted the heater the flame came through the two holes; he considered this was an improper adjustment, and he removed the orifice, which was a No. 51, and put in a smaller orifice, which was a No. 57; on January 17th, he returned to room 12, disconnected the heater and turned it over to the police department; on February 4th, he went to room 12 and installed the heater, as nearly as he could, in the same "spot" it was in before he removed it; on February 16th, he removed the heaters from all the rooms in the hotel at the request of defendant, and 20 of the 47 or 49 heaters were similar to the heater in room 12.

Mr. Berry, called as a witness by the People, testified that he had been a consulting gas engineer since 1926; he had been employed by the district attorney to make an investigation in this case; on February 4th, he went to room 12 and conducted certain tests in the presence of another engineer, defendant and others; he examined the old flue—it was a rectangular cement flue, very commonly used in the

old buildings; the cement type of vent heats much more slowly and thus creates an upward draft of air much more slowly than a metal vent; a cold flue, particularly of cement construction, creates practically no draft until some heat has been supplied from a heater; they found that, before the heater was connected to the flue, there was a flow of air down the flue instead of an upward flow of air; he made an examination of the heater, and in his opinion it is a dangerous appliance; the two holes in the top of the heater were not there originally and evidently were drilled subsequent to the purchase of the heater; while he was present, the heater was lighted; the effect of lighting the cold heater would be that some of the unburned gas would escape through the two holes in the top and would probably be very high in carbon monoxide; when the heater was hot, the gas would burn "in the open air" at the top of the heater; he did not think the holes in the top of the heater had much bearing one way or the other upon whether the heater was safe. He testified further that all hot products of combustion have a tendency to rise and it is difficult to get them down without a positive draft; with the vent outlet of the heater below the level of the burner, the heater would not burn with real combustion unless connected with a vent and provided with a draft to pull the products of combustion out of the heater; until there was enough warm air in the vent to create a considerable draft, these products would be spilling out of the opening below and through the holes in the top; without a vent connection, the amount of gas which could be safely burned in that heater would be infinitesimal; with a vent connection, a supply of 18 to 20 feet into that heater would be entirely excessive, at least while the flue was cold and had not created a very substantial draft; it also would be excessive with those two holes in the top—where the draft would not pull out the products that were escaping from the top; the heater, without the vent being connected, might burn a very low rate of gas satisfactorily, but if it were turned on fully, with a No. 51 orifice, it could not burn satisfactorily and the effect would be dangerous; when the burner is above the vent outlet it is bad construction as far as safety is concerned; the heater could be dangerous even with a vent properly connected unless it established a draft in the chimney quickly.

Another witness, called by the People, testified that he was assistant manager of the American Gas Association Laboratories, Incorporated, a nationally recognized testing lab-

oratory for gas appliances; its function, in making tests for manufacturers of gas appliances, is to determine whether the appliance is safe; they keep a record of the manufacturing concerns and the various types of space heating equipment which have been inspected and approved generally; that the heater here involved is not listed in their directory, which includes all approved gas appliances; the vent pipe of the heater herein is not connected tightly with the heater, and it could be knocked off by bumping it.

Mr. Fairchilds, called as a witness by defendant, testified that he is a consulting gas engineer; he was in room 12 when Mr. Berry conducted the tests; they were fairly and scientifically conducted, and the proper equipment was used; within a few minutes after the heater was lighted there was a strong odor of aldehydes which indicated that there was carbon monoxide present in substantial quantities; the heater was overfired and overpiped; the safe quantity of gas which could be piped into the heater and burned in that room would not be over 7 cubic feet an hour; the holes in the top of the heater would take care of some of the overfiring, and they would tend to cause additional combustion; the heater is the only one of that description he has ever seen with holes in it; it is not necessarily true that, with the two holes in the heater, some of the gas would escape into the room unconsumed; without the holes in the top, the heater would be apt to go out and not burn at all when first lighted; he did not consider that the heater was of a safe design, and he would not recommend that the heater have holes in the top; the vent, being below the burner, precludes the removal of all the noxious fumes; a concrete vent is one of the poorest types for a heater of this kind; they went to the roof and "checked," and after the heater had been burning for two hours the vent was not handling the fumes from that heater.

Defendant's wife testified that she has been employed at the hotel continuously as a clerk or manager since her father bought the hotel; after the bodies were discovered she saw defendant go into the room and he did not close the door; she (witness) did not go into the room with him but remained near the door; the maid never made any complaint to defendant in her presence that the heater was out of working order.

Defendant testified that he had worked at the hotel since January, 1950; his duties were to check people in, see that they were comfortable and act as clerk and manager of the

hotel; he did not pay the insurance or the rent on the hotel—Mr. Snyder did that; when the plumbing and heaters had to be replaced he had nothing to do with it—Mr. Snyder and the bank had them replaced; prior to January 12, 1952, he never had any heaters disconnected and capped, or removed from the hotel; he never had any notice from anyone that any heater was defective prior to that time; the maid did not tell him, prior to January 12, 1952, that the tenants were complaining about the heaters; she never told him that a woman had complained to her that the pipe was out of the heater in room 12; she never told him that the vent pipe was disconnected from the heater; after she told him on January 12th that something was wrong in room 12, he entered the room, went over and saw that the gas was off, looked toward the bodies on the bed and walked out; he did not touch anything; he did not notice the vent pipe; he had no arguments with the maid—she would ask about something to do and he would tell her what to do; he had a disagreement with her over the disappearance of a clock on the day she quit; the maid never reported anything that needed fixing to him; at all times he and his wife were the persons in charge at the hotel.

It does not appear whether appellant knew, prior to the deaths, that Mr. and Mrs. Wallace had registered at the hotel or that they were occupants of room 12.

As above shown, appellant was charged in two counts with manslaughter, and he was found guilty as charged. The following instruction was given: "Manslaughter is the unlawful killing of a human being without malice. One kind of manslaughter, the definition of which is pertinent in this case, is involuntary manslaughter, being that which is done in the commission of an unlawful act not amounting to a felony, or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection." It cannot be determined whether the verdict was based upon a finding that appellant committed an unlawful act, or that he committed a lawful act in an unlawful manner or without due caution and circumspection.

█ A question herein is whether appellant committed an unlawful act. The People argue that appellant violated certain provisions of the State Housing Act (Health & Saf. Code). The provisions referred to are: that the internal area of the vent (in the wall leading to the outside air) shall not be less than 12 square inches (Health & Saf. Code,

§ 16902) ; that every gas burning appliance shall be approved by a nationally recognized testing agency (Health & Saf. Code, § 16900) ; and that every gas vent or gas appliance shall be maintained in good repair (Health & Saf. Code, § 16905).

Defendant contends that the duty to comply with those provisions of the State Housing Act did not rest upon him as an employee of the lessee.

As above shown, the internal area of the cement vent in the wall was 8 square inches, which was smaller than the minimum area required by the State Housing Act (12 square inches). In order to increase the size of the wall vent to comply with the statutory requirement it would have been necessary, of course, to make a major structural alteration of the hotel building. It does not appear that the defendant was authorized by the owner or lessee or anyone to make any structural change in the building. He had no statutory duty to make a structural change in the building. Furthermore, it is provided in section 41, chapter 1127, (p. 2895) of the Statutes of 1951 Regular Session, that no provision of the act "shall be construed to require a structural addition, structural alteration or a structural change in or on an existing building or the replacement of an existing appliance which requires a structural addition, structural alteration or a structural change in or on an existing building where such is not required by law prior to the effective date of this act." An instruction was given which embodied the provisions of said section 41. There was no evidence that the hotel building was not in existence prior to the enactment of the statute, in 1937, requiring that the internal area of a vent be not less than 12 square inches. The appellant did not commit an unlawful act in failing to enlarge the wall vent.

■ The provision of the State Housing Act that "Every gas burning appliance shall be approved by a nationally recognized testing agency" is uncertain and vague. It cannot be determined from that act or any statute (1) what is meant by the words "a nationally recognized testing agency" or (2) whether any such testing agency exists by virtue of any statute; or (3) whether any such agency is empowered by law to issue any certificate of approval. Section 15004.2 of the Health and Safety Code does state that " 'Approved agency' means an established and recognized agency regularly engaged in conducting tests or furnishing inspection services, and approved by the enforcement agency." That section, however, does not define "a nationally recognized

testing agency." ■ "[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law." (*Connally* v. *General Construction Co.*, 269 U.S. 385, 391 [46 S.Ct. 126, 70 L.Ed. 322].) In any event, even if the testing agency, so referred to, were a duly authorized and specifically designated governmental agency, it does not appear that appellant was authorized or had the duty to (1) ascertain whether approval of the heater by such agency had been given, (2) obtain such approval, or (3) remove the heater if it had not been so approved. ■ The appellant did not commit an unlawful act in failing to obtain approval of the heater by "a nationally recognized testing agency."

As above shown, the vent outlet of the heater was below the level of the burner. The expert testimony was that such construction was unsound, the design was unsafe, and the heater might be dangerous even when properly connected to the vent pipe. There were similar heaters in approximately 20 other rooms in the hotel. It is apparent that the cost of purchasing and installing heaters of different construction and design would be extensive. The appellant was manager of the hotel. He testified that his duties were to act as clerk and manager, and to check people into the hotel. He also testified that when the heaters and plumbing had to be replaced the bank (owner) and Mr. Snyder (lessee) had them replaced. There is no evidence that appellant was required under any agreement with the owner or lessee to purchase and install new heaters or repair the heaters which were in the hotel. ■ The two respects in which the heater was allegedly in disrepair, as distinguished from the faulty construction and design of the heater, were: (1) the two holes in the top of the heater, and (2) the oversize of the vent outlet, in the back of the heater, which caused the vent pipe to fit loosely in the heater. Each of said two holes was one-half inch in diameter. The holes were not the result of deterioration, but were placed in the heater after it had been purchased, apparently for the purpose of improving it. There was expert testimony that if the holes were not there, it is likely that the heater would "go out" when first lighted. Also, there was expert testimony that the holes did not have much bearing on whether the heater was safe, and that with

the holes in the heater the draft would not pull out all "the products" and they would escape into the room. It does not appear that appellant knew that the holes were not a part of the original construction and design of the heater. Even if appellant, by reason of the mere fact that he was manager, had a legal duty to maintain the heaters in good repair, it is not reasonable to conclude, under the evidence herein, that he had a duty to close those holes in the heater. The appellant did not commit an unlawful act in failing to close those holes.

As to the matter of repairing the loose connection between the vent pipe and the heater, it cannot be concluded, merely because appellant was manager, that he committed an unlawful act in not repairing the connection. He was not charged with knowledge of the loose connection merely because he was the manager. It was a question of fact, whether he, as manager, knew or should have known of the loose connection.

Another question herein is whether appellant committed a lawful act without due caution and circumspection. As above shown, there was evidence to the effect that the maid notified appellant on two occasions prior to the deaths that the end of the vent pipe (which connected with the heater) was out of the heater and lying on the floor. Appellant testified to the effect that he had not been so notified; and that he did not know that the vent pipe connection or the heater was defective. The maid testified further that she and appellant quarreled frequently during the time she worked at the hotel, and when she quit working there she was angry with him. The evidence as to whether appellant knew or should have known of the defective condition of the vent pipe connection was conflicting,—it was legally sufficient to support either a finding that he knew or should have known of such condition, or a finding that he did not know and should not have known of it. Appellant argues to the effect that, in view of that close question of fact, certain instructions given at the request of the People were erroneous. He refers (1) to an instruction defining negligence and ordinary care as those words are usually defined in civil cases (People's instruction No. 18); and (2) to instructions which include statements to the effect that in a manslaughter case negligence, or lack of due caution and circumspection, does not need to amount to wantonness or recklessness (People's instructions Nos. 30 and 16.) The instructions so referred to, except No. 16, are quoted in the

margin below.[1] Instruction No. 16 was as follows: "Due caution and circumspection, as those words are used in the instruction just given, mean such caution and circumspection as are reasonably appropriate to avoid injury to one's self and others, under the conditions at hand as they would be viewed by an ordinarily reasonable person in the same situation as the person whose conduct is in question. To exercise due care and circumspection is to take those proper precautions which a person of ordinary prudence would use in the same circumstances. [*Conduct does not need to amount to wantonness or to recklessness to show and to constitute a lack of due care and circumspection.*]" (Italics added.) Section 192 of the Penal Code, which defines manslaughter, states in part that "Manslaughter is the unlawful killing of a human being, without malice. It is of three kinds: 1. Voluntary . . . 2. Involuntary— . . . in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection; . . . 3. In the driving of a vehicle . . . " As above stated, the court instructed the jury as to involuntary manslaughter in the words of that statute—(in part) that involuntary manslaughter might be committed in the commission of a lawful act "without due caution and circumspection." Appellant asserts that the instruction defining "Negligence" and "Ordinary Care," which was given herein,

[1] Instruction No. 18.—"Negligence is the doing of some act which a reasonably prudent person would not do, or the failure to do something which a reasonably prudent person would do, actuated by those considerations which ordinarily regulate the conduct of human affairs. It is the failure to use ordinary care in the management, control and use of one's property or person. Ordinary care is that care which persons of reasonable and ordinary prudence exercise in the management of their own affairs in order to avoid injury to others.

"In deciding whether or not a person was negligent in a given case, the conduct in question must be considered in the light of all the surrounding circumstances and the danger that reasonably should have been apprehended."

Instruction No. 30.—"You are instructed that when a person is doing anything dangerous in itself, or has charge of anything dangerous in its use, and acts with reference thereto without taking those proper precautions which a person of ordinary prudence would have used under the circumstances, and the death of another results therefrom, his act of negligence is a criminal act against the person so killed, *even though his negligence does not amount to a wanton or reckless disregard of human safety or life.*

"With reference to a lawful act done in an unlawful manner, in order to constitute this kind of manslaughter, the act may be lawful but it must be one which might produce death and which does produce death and it must be committed without due caution and circumspection. *The lack of due caution and circumspection need not go to the extent of being wanton or reckless.*" (Italics added.)

is not applicable in a trial upon a charge of involuntary manslaughter "in the commission of a lawful act . . . without due caution and circumspection." It is to be noted that the word "negligence" is not used, in said section 192, in defining involuntary manslaughter. That word is used in said section in defining manslaughter "In the driving of a vehicle"—it is there stated that such manslaughter might be committed in the commission of a lawful act with or without gross negligence. It would seem that if the Legislature had intended that the words "due caution and circumspection" should be synonymous with ordinary negligence it would not have used those different expressions in defining said two kinds of manslaughter. In *People* v. *Wilson,* 78 Cal.App.2d 108 [177 P.2d 567], wherein the charge was manslaughter committed while driving an automobile with gross negligence, it was held that it was not error to give an instruction defining ordinary negligence. In *People* v. *Anderson,* 58 Cal.App. 267 [208 P. 324], wherein the charge was manslaughter, it was held (p. 269) that all the words in the expression " 'due caution and circumspection' are in common and daily use and are understood by the average person," and it was not error to refuse to give an additional instruction that said words mean the same as criminal negligence. The court said therein at page 271: "Ordinarily, the language employed by the legislature in defining a crime is deemed to be best suited to that purpose, and error cannot be predicated upon its use in informations and instructions." It was also said therein, at page 271: " 'Negligence' is a word that has acquired a highly specialized meaning and whole volumes have been written upon it; but the words 'due caution and circumspection' as used by the trial court have their common and ordinary meaning and no other. When these words are stated to the jury they import to them this common meaning without further amplification." In certain instructions which were given, the court attempted to amplify the meaning of the words "due caution and circumspection." As above shown, instruction No. 30 (marginal note 1) ends as follows: "The lack of due caution and circumspection need not go to the extent of being wanton or reckless." Instruction No. 16, quoted above, ends as follows: "Conduct does not need to amount to wantonness or to recklessness to show and to constitute a lack of due care and circumspection." In *People* v. *Pociask,* 14 Cal.2d 679 [96 P.2d 788], wherein defendant was convicted of negligent homicide under section 500 of the Vehicle Code then in

effect (driving an automobile in a negligent manner), the court instructed the jury that a verdict of guilty on a charge of negligent homicide might be returned if the jury should find that the defendant was guilty of negligence resulting from a failure to exercise ordinary care. The defendant therein claimed error in the refusal of the court to give his requested instruction to the effect that the negligence must be such as would amount to a flagrant and reckless disregard of the safety of others, or consist of the doing of a lawful act in a culpably reckless manner. The court therein said, at page 683, "But, in answering the question of what constitutes criminal negligence, the court is bound to apply an appropriate definition enacted by the legislature. Only when the legislature has not properly defined a term is it necessary for the courts to look to the meaning thereof as understood in the common law. . . . This court has consistently refused to add to the words of pertinent statutes any formulae clearly not included within the plain language thereof. . . . In denying a hearing in this court . . . in *People* v. *Seiler*, 57 Cal. App. 195 [207 P. 396] (conviction of manslaughter growing out of the negligent driving of an automobile), this court expressly disapproved the use of the words 'wanton' and 'reckless,' and indicated the inaptitude of the word 'culpable,' in describing the idea to be conveyed by the phrase, 'without due caution and circumspection' used in the statute." It was also stated in the Pociask case at page 686: "When the legislature has so spoken and the court has stated the law to the jury in the language of the applicable statutes, it is not required to do more. (*People* v. *Fowler, supra; People* v. *Anderson, supra.*) Therefore, what may amount to a lack of 'due caution and circumspection' in cases of involuntary manslaughter committed in the doing of a lawful act, or what may constitute the driving of a vehicle 'in a negligent manner,' are questions to be decided by the jury according to the particular facts in each case guided by appropriate instructions from the court." (That statement is quoted in *People* v. *Amick*, 20 Cal.2d 247, 253 [125 P.2d 25].) The court should not have included in its instructions the statement to the effect that a lack of due caution and circumspection need not amount to wantonness or recklessness. People's instruction No. 16, except for the statement therein in brackets (to the effect that the conduct need not amount to wantonness or recklessness), was a proper instruction.

It is also to be noted that the court gave three instructions pertaining to criminal negligence. In instruction No. 30 (marginal note 1), it was stated in effect that an act of negligence may be a criminal act even though the negligence does not amount to wanton or reckless disregard of human safety or life. Another instruction was as follows: "In crimes such as those of which defendant is accused . . . there must exist a union or joint operation of act and intent or criminal negligence." A further instruction was to the effect that the word "negligence" is a relative term, and that in deciding whether "certain conduct in question amounted to criminal negligence," the conduct must be considered in the light of all the surrounding circumstances. ▮ It thus appears that, in submitting to the jury the issue as to whether appellant acted "without due caution and circumspection," the court, in addition to instructing the jury in the words of the statute regarding due caution and circumspection, gave instructions as to what due caution and circumspection need not amount to; and also gave instructions regarding ordinary negligence and criminal negligence. Therefore, the jury had for its consideration, in determining whether appellant acted without due caution and circumspection, instructions pertaining to four classifications or kinds of conduct, namely, ordinary negligence, criminal negligence, due caution and circumspection, and conduct not amounting to wantonness or recklessness. Such instructions tended to confuse the jury as to the standard of conduct required of appellant. If the verdict herein was based upon a finding that the deaths resulted from conduct of appellant in committing a lawful act, it cannot be determined, in view of such instructions, whether such conduct was ordinary negligence, or criminal negligence, or without due caution and circumspection, or was conduct that did not amount to wantonness or recklessness. The court erred prejudicially in giving said instructions.

The judgment and the order denying the motion for a new trial are reversed.

Shinn, P. J., and Vallée, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied June 11, 1953. Carter, J., and Spence, J., were of the opinion that the petition should be granted.