[Crim. No. 15917. In Bank. Jan. 25, 1972.]

THE PEOPLE, Plaintiff and Respondent, v.
STEVEN J. RHODEN, Defendant and Appellant.

**COUNSEL**

Steven J. Rhoden, in pro. per., and Earl Klein, under appointment by the Supreme Court, for Defendant and Appellant.

Evelle J. Younger, Attorney General, William E. James, Assistant Attorney General, and Robert F. Katz, Deputy Attorney General, for Plaintiff and Respondent.

**OPINION**

**MOSK, J.**—This is a petition for recall of the remittitur after an affirmance by the Court of Appeal of a judgment convicting defendant on various felony counts.

All the events took place on the evening of May 6, 1967, and in the same neighborhood of Los Angeles. The first victim, James Baker, testified that about 8 or 8:30 p.m. he was drinking beer in a bar when defendant, whom he characterized as "a very good friend of mine," entered and said there was someone outside who wanted to see him. They walked out the door, and Baker was invited to enter a parked car by an unidentified man who said he was its owner. Baker did so, and the man sat in the driver's seat while defendant entered on the passenger side. The man then described the car as being in good running condition, asked Baker if he wanted to purchase it, and offered to take him for a test drive. Baker declined, explaining he had left a glass of beer on the bar and preferred to finish it. The man nevertheless started the car and drove off with Baker sitting between him and defendant.

After traveling some 10 or 12 city blocks, the driver stopped next to the Denker Playground. He alighted from the car and apparently began to

cross the street towards a residence. Defendant exited from the passenger side and stood at the front of the car with his back to Baker, who remained in the vehicle. After a time defendant suggested to Baker that he also get out and "relax and stretch." As Baker opened the door to do so, he was knocked unconscious by a blow on the side of the head. When he awoke defendant and the other man were gone, his shoes had been removed, his trousers torn, and his wallet, watch, and ring were missing.

The second victim, Martha Nelson, testified that about 10 p.m. the same evening she was walking towards a bus stop when defendant, whom she had known for some five years, appeared in a car driven by an unidentified man. Defendant asked where she was going, and when she said "Home," offered to take her there. She entered the car, and sat as directed in the front seat between the two men.

As soon as they drove away defendant punched Mrs. Nelson in the nose several times and caused a nosebleed, and each man threatened her with a knife. Defendant took her purse and opened it, then threw it out of the car window; indeed, as they drove along he proceeded to take all her clothes off and throw them out of the window as well, piece by piece. The driver stopped the car at the Denker Playground, but defendant directed him to continue on to defendant's nearby house. There they forced Mrs. Nelson inside and removed all their own clothes. Defendant began an act of rape, but was interrupted when his mother, who lived in an adjoining portion of the house, knocked on the door and asked what he was doing. Defendant replied "Nothing," jumped up, put on his pants, and ran out. The direct distance between the point where Mrs. Nelson entered the car and defendant's house is some 10 or 12 blocks, but Mrs. Nelson estimated that her abduction lasted a total of 2 or 2½ hours.

On this record defendant was charged with and convicted of the following offenses: robbery of Baker (count I), kidnaping of Baker for the purpose of robbery (count II), rape of Mrs. Nelson (count III), kidnaping of Mrs. Nelson for the purpose of robbery (count IV), and robbery of Mrs. Nelson (count V). On the kidnaping counts the jury further found that each victim "was subjected to bodily harm." In such circumstances Penal Code section 209 directs that the defendant shall suffer either death or life imprisonment without possibility of parole, and vests this choice in the trial jury. Here, however, the jury was not called upon to make this determination, but was erroneously discharged upon rendering their verdicts. The court thereafter denied a motion for new trial and a motion to reduce the convictions on counts II and IV to simple kidnaping (Pen. Code, § 207), and entered judgment sentencing defendants on those counts to life im-

prisonment without possibility of parole. The court suspended the imposition of sentence on the rape and robbery counts.[1]

The judgment was affirmed by the Court of Appeal in an unpublished opinion on February 24, 1969, and we denied a hearing. On October 2, 1969, we filed our decision in *People* v. *Daniels*, 71 Cal.2d 1119 [80 Cal. Rptr. 897, 459 P.2d 225], reconsidering the intent of the Legislature in amending Penal Code section 209 in 1951; on March 24, 1971, we filed our decision in *People* v. *Mutch*, 4 Cal.3d 389 [93 Cal.Rptr. 721, 482 P.2d 633], holding that a defendant whose conviction under section 209 became final before our decision in *Daniels* is entitled to post-conviction relief upon a showing that, as a matter of law, his conduct was not prohibited by the statute as we construed it in *Daniels*.

Defendant, now represented by other counsel, petitions for recall of the remittitur on the foregoing grounds. Upon analysis of the record, however, a more fundamental issue has emerged for decision, i.e., whether defendant received constitutionally effective assistance of counsel on appeal within the meaning of *In re Smith* (1970) 3 Cal.3d 192 [90 Cal.Rptr. 1, 474 P.2d 969]. As will appear, we conclude that defendant was denied that assistance and hence is entitled to a redetermination of his appeal.

The defendant in *Smith* was convicted on multiple counts of kidnaping and rape. The sole brief filed by his court-appointed counsel on appeal, however, consisted of a 20-page recitation of facts and a one-page argument which made only a single point, i.e., that the defendant was entitled to reversal because the People had failed to expressly prove he was not married to his rape victim. The Court of Appeal held the contention to be devoid of merit, and affirmed the judgment.

On the defendant's subsequent petition for habeas corpus, we agreed that his counsel's point on appeal was frivolous but went on to observe that the record would have supported a number of other, far more substantial allegations of error. These contentions related primarily to the fairness of the lineup identification procedure and the sufficiency of the evidence to establish critical elements of the attempted kidnaping count. We explained (at

---

[1]Apparently realizing its error in discharging the jury without submitting the question of penalty to them, the court later amended the trial minutes "to show that counsel stipulate that the Judge may determine the penalty" on the kidnaping counts; thereafter the court purported to amend the judgment *nunc pro tunc* pursuant to that authorization, but in fact reimposed the same sentence as indicated above. This procedure was also error, as defendant was entitled to a trial by jury on the penalty issue and his counsel could not "stipulate" away that right without defendant's personal waiver. The Court of Appeal held that both errors were nonprejudicial because the penalty imposed by the court was the less severe of the two which should have been submitted to the jury, and in any event the errors were waived by counsel's failure to raise them either at trial or on appeal.

p. 202) that "We have catalogued the arguments which petitioner's counsel failed to offer on behalf of his client, not because we conclude that petitioner was likely to obtain a reversal on appeal, but only to demonstrate that his appellate counsel did not render the thoughtful assistance to which he was entitled. Petitioner need not establish that he was entitled to reversal in order to show prejudice in the denial of counsel." Rather, we concluded (at pp. 202-203), "the inexcusable failure of petitioner's appellate counsel to raise crucial assignments of error, which arguably might have resulted in a reversal, deprived petitioner of the effective assistance of appellate counsel to which he was entitled under the Constitution." Accordingly, we treated the petition as an application to recall the remittitur, transferred the cause to the Court of Appeal with directions to recall its remittitur, vacate its decision, reinstate the appeal, and appoint other counsel for the defendant.

The appellate history of the case at bar is strikingly similar to *Smith*. Here, as we have seen, defendant stood convicted of no less than five serious felonies involving rape, robbery, and aggravated kidnaping, and was sentenced on two of those counts to the most severe penalty short of death—imprisonment for the rest of his natural life without possibility of parole. Yet despite the extreme gravity of defendant's predicament, his court-appointed counsel on appeal appears to have accorded him only pro forma assistance. Counsel's opening brief was not filed until six months after the record on appeal was prepared, and even so amounted to less than six pages in all. Of these, two pages were devoted to reciting the procedure below, two and one-half pages summarized the trial testimony, and one page presented counsel's entire argument for reversal—the futile claim that the trial court was guilty of "abuse of discretion" in denying a pretrial motion to sever the Baker counts from the Nelson counts.

The frivolity of counsel's contention may be readily shown. Penal Code section 954 specifically allows an accusatory pleading to charge "two or more different offenses connected together in their commission, . . . or two or more different offenses of the same class of crimes or offenses, under separate counts . . .; provided, that the court in which a case is triable, in the interests of justice and for good cause shown, may *in its discretion* order that the different offenses or counts set forth in the accusatory pleading be tried separately" (italics added). Here the two offenses which defendant was accused of perpetrating on Baker were obviously "connected together in their commission," as were the three involving Mrs. Nelson. Joinder of these two groups of charges, in turn, was proper under section 954: the two robberies, like the two kidnapings, were obviously "offenses of the same class," and it is well settled that the crime of rape

shares with robbery and kidnaping sufficient common characteristics as an assaultive crime against the person to be jointly chargeable therewith. (See, e.g., *People* v. *Kemp* (1961) 55 Cal.2d 458, 476 [11 Cal.Rptr. 361, 359 P.2d 913]; *People* v. *Chessman* (1959) 52 Cal.2d 467, 492 [341 P.2d 679]; *People* v. *Walker* (1952) 112 Cal.App.2d 462, 471 [246 P.2d 1009]; *People* v. *Van De Wouwer* (1949) 91 Cal.App.2d 633, 639 [205 P.2d 693].) In these circumstances it was sheer fantasy to claim that the trial court abused its statutory discretion in denying severance. Inasmuch as counsel's brief is devoid of any citation of authority, be it case, statute, or treatise, we can only conclude that counsel did not see fit to do even the minimal amount of legal research needed to realize the patent lack of merit in his contention.[2]

More important, however, are the substantial assignments of error that counsel did *not* raise on this record. To begin with, as the Attorney General pointed out in his brief on appeal, defendant's counsel offered no criticism whatever of the instructions given to the jury.[3] Yet a strong argument could have been made that the instructions defining kidnaping, the most serious offense charged, were defective.

The first instruction on this issue told the jury that a kidnaper is one who, inter alia, merely "holds or detains" his victim for the purpose of committing robbery.[4] That language, however, is taken not from the current statute but from section 209 *as it read in 1933* (Stats. 1933, ch. 1025, p. 2617; see *People* v. *Knowles* (1950) 35 Cal.2d 175, 180 [217 P.2d 1]); the section has not thus defined the crime of kidnaping under California law since it was deliberately amended to eliminate that language two decades ago (Stats. 1951, ch. 1749, p. 4167; see *People* v. *Tribble* (1971) 4 Cal.3d 826, 831 [94 Cal.Rptr. 613, 484 P.2d 589]). Minimal effort on counsel's part would have been needed to see the potential success of urging the prejudicial effect of such an instruction, which purported to turn back the clock to a much earlier day and permitted the jury to find aggravated kidnaping in the absence of any asportation whatever—in short, to convict

---

[2]A glance into Witkin's California Criminal Procedure, for example, would have taught counsel that as a matter of practice "The statutory policy favoring joint trials has been so consistently applied that cases holding it an abuse of discretion to deny a severance are virtually nonexistent," and when the test of joinder is met "the difficulty of showing prejudice from denial of severance is so great that the courts almost invariably reject the claim of abuse of discretion." (*Id.* at pp. 286, 288.)

[3]Neither this nor a similar observation on defendant's acquiescence in the sufficiency of the evidence prompted defense counsel to file a reply brief.

[4]The instruction was apparently reinforced by another which advised the jury to return a verdict of simple kidnaping if they entertained a reasonable doubt whether defendant acted with the intent "to hold or detain such person . . . to commit robbery."

defendant by means of a criminal definition which by 1967 had long vanished from the statutes.

■ It is true the jury were thereafter instructed, in the current language of section 209, that a kidnaper is one who "kidnaps or carries away" another to commit robbery; but obviously it could have been contended, under a well settled principle of appellate review, that the prejudice was not cured because the two instructions were contradictory or at least so inconsistent as to confuse the jury and to make it impossible for the reviewing court to know which of the two definitions of kidnaping they actually followed. (See, e.g., *People* v. *Cornett* (1948) 33 Cal.2d 33, 41 [198 P.2d 877]; *People* v. *Dail* (1943) 22 Cal.2d 642, 653 [140 P.2d 828]; *People* v. *Neff* (1953) 117 Cal.App.2d 772, 782, 786 [257 P.2d 47].)[5]

■ The court correctly gave a special instruction (now CALJIC (3d ed.) No. 9.26) explaining there is no kidnaping "When one in the exercise of his own free will, and with knowledge of what is taking place with respect to his person, voluntarily and willingly consents to accompany another. . . ." But the court followed that immediately with a general, all-purpose instruction (now CALJIC (3d ed.) No. 1.23) defining "consent" to exclude the conduct of one who acts, inter alia, "under the influence of fraud." Even a cursory examination of the relevant statute would have suggested an arguably meritorious contention on appeal.

■ Penal Code section 207 provides three distinct definitions—one general and two special—of conduct constituting "kidnaping" under the law of California. The general definition characterizes kidnaping as the act of one who "*forcibly* steals, takes, or arrests any person in this state, and carries him into another country, state, or county, or into another part of the same county"; the special definitions refer to the act of a person (1) "who hires, persuades, entices, decoys, or seduces *by false promises, misrepresentations, or the like,* any person to go out of this state . . . with the intent to sell such person into slavery," or (2) "who, being out of this state, . . . takes by force *or fraud* any person contrary to the law of the place where such act is committed, and brings, sends, or conveys such person within the limits of this state. . . ." (Italics added.)

As the emphasized language makes clear, the Legislature has thus deliberately provided that whereas the two special types of kidnaping (transpor-

---

[5]The relevance of the element of asportation was further diminished by the giving of the "*Chessman* instruction," stating that to constitute kidnaping the victim need not be moved "a long distance or any particular distance." While we cannot fault counsel in the case at bar for not foreseeing the demise of that instruction only 16 months later in *People* v. *Daniels, supra,* we note that other counsel have had the prescience to so argue. (See *People* v. *Mutch* (1971) *supra,* 4 Cal.3d 389, 394, fn. 2.)

tation out of state for sale into slavery; unlawful transportation into state for any purpose) can be accomplished by means of fraud, a general act of kidnaping—such as here charged—can only be accomplished by the use or threat of force. ▇ In these circumstances defendant's counsel obviously could have contended that giving the foregoing general instruction on consent was error because it permitted the jury to convict his client of "kidnaping" on proof of fraud alone. And the error, it could have been argued, was especially prejudicial as to the conviction of kidnaping Baker; on the facts, as will appear, the issue of Baker's consent was crucial to the defense against that charge.[6]

The second group of colorable assignments of error that counsel could well have urged to the appellate court relates to the sufficiency of the evidence to establish certain critical elements of the kidnaping charges. Again, as the Attorney General pointed out in his brief on appeal, defendant did not challenge that sufficiency;[7] not surprisingly, the Court of Appeal was led to conclude that the evidence of guilt on each count was "overwhelming." Yet a diligent and sympathetic counsel could have delineated a dramatically different view of the facts.

With respect to count II, an appealing case could have been made for the proposition that the asportation of Baker did not amount to the offense of kidnaping because it was not "forcible" within the meaning of section 207. Seen most favorably to the People, the evidence disclosed that defendant lured Baker into his confederate's car under the pretext of taking him for a test drive, but pursuant to a secret plan to rob him. That plan, however, remained secret. Baker initially entered the car not because of force or threat of force, but simply because defendant—whom he believed to be his "very good friend"—had asked him to do so. Although he told the driver and defendant he would rather not go on a test drive at that time, his sole reason was because "I had a beer at the counter

---

[6]Other instructional errors were also overlooked by counsel. Thus the trial court directed the jury to determine whether defendant was "armed with a deadly weapon" during the alleged kidnaping of Mrs. Nelson; the jury so found, and the judgment so recited. Appellate counsel failed to question this procedure, but the Court of Appeal on its own motion struck the recital from the judgment as surplusage. The trial court also instructed that the punishment to be imposed in this case "is a matter which lies with the court or other governmental agencies." With respect to the aggravated kidnaping counts, of course, this was error; as noted above (fn. 1, *ante*), the Court of Appeal held that the error was nonprejudicial and in any event *was waived by counsel's failure to raise it on appeal.*

[7]The brief filed by defense counsel made only the implausible claim, in arguing prejudice from the alleged misjoinder, that defendant did not "commit" the offenses against Baker because he "could not have been" the person who struck the blow, and that on the other counts Mrs. Nelson "could have been attempting to frame" him.

. . . and I didn't want to leave my beer." The record is devoid of evidence that Baker persisted in his objection after the drive began; on the contrary, he made no effort to leave when the car stopped shortly afterwards, but sat alone in the front seat, apparently ignored by his companions, until defendant invited him to get out and "relax and stretch." Throughout these events, accordingly, Baker had not the slightest notion he was being "kidnaped for the purpose of robbery"; as far as he was concerned, the most unpleasant fate befalling him was that his beer was getting warm.

Nor should counsel have had difficulty in dealing with the fact that Baker was thereafter struck a blow on the head. It was certainly arguable, for example, that the blow was the only "force" used against Baker; that it occurred after the asportation was completed, inasmuch as defendant and his confederate had reached the place where the robbery was to be committed; and that it was therefore administered for the purpose of effectuating or facilitating the robbery alone. Such an unrelated event, it could have been contended, did not make the prior asportation "forcible."[8]

Turning to count IV, deficiencies arguably appear in the evidence bearing on the no less critical requirement of section 209 that the kidnaping be "to commit robbery." At the time defendant's appellate brief was prepared, *People* v. *Smith* (1963) 223 Cal.App.2d 225, 234 [35 Cal.Rptr. 719], and *People* v. *Lindsay* (1964) 227 Cal.App.2d 482, 508-510 [38 Cal.Rptr. 755], had been on the books for several years, holding that a defendant cannot be guilty of kidnaping "to commit robbery" unless it is proved he formed an intent to rob *before* the asportation began.[9] Applying that rule, counsel could plausibly have contended there was no such showing in the case at bar, and that the course of events demonstrated rather that defendant's motivation regarding Mrs. Nelson was predominantly sexual and remained so throughout the stripping and raping of his

[8]The contention would not necessarily be inconsistent with the rule, developed mainly in cases involving sexual assault, that the fact a victim enters an automobile voluntarily does not mean a subsequent forcible asportation of that victim cannot be punished as kidnaping. (See, e.g., *People* v. *Trawick* (1947) 78 Cal.App.2d 604, 606 [178 P.2d 45], and cases cited.) Counsel could have argued that such cases are distinguishable on the ground that in each the asportation was still continuing at the time force was applied to the victim, whereas here all such movement had terminated.

[9]We are aware that a contrary rule was stated, without discussion of *Smith* and *Lindsay*, in *People* v. *Paxton* (1967) 255 Cal.App.2d 62, 72 [62 Cal.Rptr. 770], and *People* v. *Gomez* (1967) 252 Cal.App.2d 844, 859 [60 Cal.Rptr. 881]. In such circumstances, however, counsel should not simply remain passive until this court undertakes to resolve the conflict; rather, it is counsel's duty as advocates to analyze the rules in issue and urge the adoption of that which they deem to be the better reasoned of the two. As matters turned out, we approved the *Smith-Lindsay* line of cases in *People* v. *Tribble* (1971) *supra,* 4 Cal.3d 826, 830-832.

victim. In support of this contention it could have been emphasized there is no direct evidence that defendant removed anything from Mrs. Nelson's purse, whereas it is undisputed that he proceeded to throw both that purse and all her clothing out of the car window as they drove along. Such conduct could be viewed as merely preparatory to the sexual assault, rather than first degree "robbery."

As in *In re Smith, supra,* we have catalogued the contentions which defendant's appellate counsel failed to raise not to imply how the merits of the appeal should have been resolved but to emphasize the gross deficiencies in counsel's presentation. We likewise conclude, for the reasons explained in *Smith,* that "the inexcusable failure of [defendant's] appellate counsel to raise crucial assignments of error, which arguably might have resulted in reversal, deprived [defendant] of the effective assistance of appellate counsel to which he was entitled under the Constitution." (3 Cal.3d at pp. 202-203.) Defendant is therefore entitled to have his entire appeal rebriefed and reargued by competent counsel, and its merits redetermined by the Court of Appeal.

This disposition renders unnecessary a present consideration of the record in the light of *Daniels* and *Mutch.* In the event of a reversal and retrial on the kidnaping charges, the relevant facts will doubtless be more fully developed and will be assessed in the first instance by the trier of fact under proper instructions. (Cf. *People* v. *Shells* (1971) 4 Cal.3d 626, 631 [94 Cal.Rptr. 275, 483 P.2d 1227].)

The matter is transferred to the Court of Appeal, Second District, Division Three, with directions to recall its remittitur in People v. Rhoden, 2 Crim. No. 14542, vacate its decision, reinstate the appeal, and appoint other counsel for appellant.

Wright, C. J., McComb, J., Peters, J., Tobriner, J., Burke, J., and Sullivan, J., concurred.

On February 23, 1972, the opinion was modified to read as printed above.