[Crim. No. 8922. Fourth Dist., Div. One. Aug. 26, 1980.]

THE PEOPLE, Plaintiff and Respondent, v.
DONALD EUGENE SKELTON et al., Defendants and Appellants.

**COUNSEL**

George C. Wetzel and Appellate Defenders, Inc., under appointments by the Court of Appeal, Stephen J. Perrello, Jr., Elaine A. Alexander and William James Zumwalt for Defendants and Appellants.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, A. Wells Petersen, Pat Zahanopoulos and Keith I. Motley, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**STANIFORTH, J.**—After a nine-month trial, the jury convicted Donald Eugene Skelton, James Evan Mack and John Richard Curtin (appellants) of multiple counts of grand theft (Pen. Code, § 487, subd. 1), sale of unqualified securities (Corp. Code, § 25110), securities fraud (Corp. Code, §§ 25401, 25541), and conspiracy to commit grand theft (Pen. Code, §§ 182, subd. 1, 487, subd. 1).

Before trial, the court denied defense motions to suppress evidence, to set aside the indictment for failure to comply with statutory procedures and a *Johnson* (*Johnson* v. *Superior Court* (1975) 15 Cal.3d 248, 255 [124 Cal.Rptr. 32, 539 P.2d 792]) motion to dismiss for claimed withholding exculpatory evidence and to sever defendants and the conspiracy count.

The jury convicted Skelton of 25 counts of grand theft, 1 count of conspiracy to commit grand theft, 27 counts in violation of Corporations Code section 25110, 35 counts in violation of Corporations Code section 25401, and 6 counts in violation of Corporations Code section 25541. Mack was convicted of 33 counts of grand theft, 1 count of conspiracy, 35, 39 and 6 counts in violation of sections 25110, 25401 and 25541 of Corporations Code, respectively. Similarly, Curtin was convicted of 19 grand theft counts, 1 conspiracy, 19, 17 and 3 counts in violation of Corporations Code sections 25110, 25401 and 25541, respectively.

Motions for a new trial were denied. Skelton and Mack were sentenced to prison for the term prescribed by law for one count of grand theft. The remaining counts were ordered concurrent with the exception of conspiracy to commit grand theft, which was ordered stayed pending service of the sentence on the other counts. Curtin's sentence was suspended and probation was granted for a period of 9 years on the conditions he serve 8 months in county jail, perform 200 hours of volunteer labor and make restitution.

FACTS

Robert Ryan created Ryan Group West (RGW) from a sole proprietorship through which he conducted his insurance business. Ryan attempted in 1972 to cover money shortfalls by organizing various investment programs under the umbrella of RGW.

These programs were broadly divisible into dairy and land investment. The dairy programs consisted of Professional Agricultural Management Company (PAMCO), Dairivest Limited Partnership (Dairivest Ltd.) and RGW Warehousing Joint Ventures (Warehousing).

*The Dairy Schemes*

PAMCO was an investment concept in which dairy cows were leased to individual investors under a management agreement. One unit of PAMCO, consisting of 50 head of cattle, was leased for $6,850. This money was represented to be used to secure feed. The investor was to receive a 20 percent return on his investment, secured from profits from the sale of milk, plus a return of capital in five years. PAMCO was por-

trayed as a "tax shelter." PAMCO became Dairivest Farms, Inc.,[1] although PAMCO continued to be listed as the management company in later leases.

Dairivest Ltd. was conceived as 20 limited partnership units at $8,500 each. This satellite operation of RGW was to take place in Yakima, Washington. The general partner was represented to be Cow Palace Limited.

None of the dairy programs were profitable enough to make promised payments to investors. Because many of these investors were also insurance customers of RGW, any loss resulting from closure of the dairies would have been disastrous to Ryan's insurance business. To obviate such a financial crisis, payment to old investors was made out of funds supplied by new investors.

In an attempt to keep the dairies afloat, bring in new money, a new investment concept was conceived to purchase hay and grain in advance, to store it for use by dairies. Warehousing contemplated a minimum investment of $3,000 into a pool until a unit of $60,000 was obtained. Skelton and Curtin assured investors money received was to be held in reserve until the target $60,000 was reached and grain was purchased. However, no grain was ever purchased and the funds were diverted to the Dairivest account, were used for salaries and operating expenses. Investment funds received from the several programs were not applied to any particular account but were diverted on an as-need basis to other programs, other needs of Ryan and the appellants.

This "pyramid" type bubble finally collapsed in December of 1974 when only 900 cows of dubious health remained to fulfill the unit (lease) obligations for 2,750 cows owed to investors. At all times, the maximum head count of cattle leased by PAMCO (Dairivest) and Dairivest Ltd. was 1,500, 1,250 under the 2,750.

### The Land Sales Schemes

RGW land programs consisted first of the "11 percent option plan" with investments from $1,000 to $10,000 in trust deeds. The investor was to receive 11 percent interest per year on his investment paid from

---

[1]Dairivest Farms, Inc., is to be distinguished from Dairivest Limited Partnership (Dairivest Ltd.).

interest on the notes secured by deeds of trust and "they would also put in a two and-a-half-acre piece of land." At the end of 10 years, RGW would return their investment or a percentage of the value of the 2.5 acre parcel supposedly worth $10,000.

The land subject to this scheme was located in Antelope Valley. It was worth less than the $10,000 claimed. It was not free and clear as represented but was mortgaged to 90 to 95 percent of its value. Further, most of the notes securing the trust deeds were owned by other entities, Trend Corporation, Land Wholesalers and Investment Administrators Incorporated, corporations controlled by principals of RGW. Again money generated was misused, embezzled, misappropriated to other investment schemes. The special program designed for Captain John Brown illustrates the land scheme in operation. In the summer of 1974, just before the collapse of RGW, Brown was promised a 15 percent return secured by specific trust deeds in exchange for $54,000. Brown's money was spent immediately to cover pressing financial needs, no trust deeds were ever assigned.

Skelton, Curtin and Mack each participated at high levels in the operation of RGW's various investment programs. Skelton spearheaded PAMCO sales teams in 1973 and by November took over the construction portion of RGW. By January 1974, Ryan turned over to Skelton responsibility for the entire organization which included control of the RGW warehousing dairy, medical complex and fourplex programs. During this period he was in control of the flow of funds in RGW. At his direction, Warehousing funds were put in the Dairivest Ltd. account. Skelton assured investors Dairivest Ltd. was financially solid and accepted investments well after he knew no new leases of cows were secured to meet the promises to the investors.

Curtin was legal counsel for RGW and held himself out as "primarily concerned with the financial responsibility" of RGW. He presented and explained the PAMCO and Dairivest Ltd. programs. He assured prospective investors they were private offerings exempt from requirements of registered securities. In letters to investors Curtin assured the soundness of the programs and their success.

Additionally, Curtin drafted the RGW warehousing program. All of Curtin's convictions arose out of the dairy and warehousing program,[2]

---

[2]Curtin's involvement is set forth in greater detail (*infra* XIII) where we examine the substantial evidence supporting his multiple convictions.

excepting the conspiracy count which encompasses all of his various activities from 1971-1974.

Mack occupied various high level executive offices in RGW and its investments. He served as executive vice president and for a period of time served as president.

Briefly he served as president of Investment Administrators Inc., the land division of RGW. In April 1972 Mack became one of five directors to RGW and eventually became executive vice president. As executive vice president he maintained substantial power controlling the inside operation of RGW.

In the fall of 1973 Mack became president and director of PAMCO and of Alameda Construction Company related to construction of Palmdale Medical Complex. His position in PAMCO made him signator on the checking account and gave him responsibility for daily decisions as to which obligations to pay. Mack did most of the negotiating for leasing the cows in the dairy programs. He was aware there were insufficient cows to meet investment obligations, yet he continued to accept new investments.

Mack transferred or directed others to transfer money from one trust purpose to another by moving funds from one program to another, e.g., from the dairy accounts to the insurance accounts. Mack and Ryan would make joint daily decisions on where to put money to cover hot spots, i.e., overdrawn accounts. Mack frequently ordered the bookkeeper to use investors' money for operating expenses.

Mack's participation in corporate efforts to raise money to solidify RGW's position was significant. The executive secretary, who took orders from Mack and others, typed two different versions of the same financial statement; and one statement would be more supportive of financial solvency. The more favorable statement was used for sales presentations.

CONTENTIONS

Appellants[3] contend (1) the indictment was defective as exculpatory evidence known to the district attorney was withheld from the grand

---

[3]Pursuant to rule 13 of the California Rules of Court, each defendant has joined in all applicable issues raised here by codefendants. Accordingly, arguments and dispositions are consolidated wherever possible.

jury and because the grand jury failed to weigh all of the evidence; (2) the court erred in denying motions for a postindictment preliminary examination; (3) motions for severance were improperly denied; (4) the seizure of documents pursuant to Corporation Commission subpoena were violative of statutory and constitutional authority and evidence obtained should have been suppressed; (5) Skelton claims he was denied the right to cross-examine and confront witnesses against him; (6) the court erred in refusing to allow the jury to determine as a matter of fact whether the investment programs constituted "securities"; (7) error occurred in failing to sustain appellants' objection to the indefiniteness of the conspiracy pleading; (8) error occurred in admitting specific evidence of coconspirators' conduct in violation of Evidence Code section 1101; (9) the trial court erred in refusing to instruct the jury must be unanimous in finding defendant's specific intent to commit grand theft during the period of his individual participation in the alleged conspiracy and at least one overt act at that time; (10) the court erred in refusing to give a multiple conspiracy instruction; (11) the court erred in instructing the jury regarding false or misleading statements in terms of CALJIC No. 2.03; (12) the evidence against Curtin is insufficient to support his convictions on any count; (13) the evidence of corporate securities fraud is insufficient to convict Mack; (14) this court (Court of Appeal) erred when it reinstated counts 61 through 76, 80 through 83, and 126 of the grand jury indictment, and (15) finally, sentencing error (Pen. Code, § 654) occurred in the imposition of multiple terms on Skelton and Mack.

DISCUSSION

I

*Grand Jury Proceedings*

■ Skelton sought to dismiss the indictment based upon the claimed failure of the prosecution to present evidence to the grand jury that would have reasonably tended to negate his guilt. (*Johnson* v. *Superior Court, supra,* 15 Cal.3d 248, 255.) The only specific evidence Skelton pointed to was an "exculpatory" statement made by him to Investigator Rassi. He also made a blanket assertion that 120 boxes of material in the possession of the district attorney should have been given to the grand jury for its examination. Skelton here alleges new facts claimed as exculpatory. The record discloses no attempt by Skelton to raise be-

low specific objection to the prosecution's failure to disclose the "investigator transcript" to the grand jury. He is precluded here. (*People* v. *Manning* (1973) 33 Cal.App.3d 586, 601 [109 Cal.Rptr. 531].)

The statement to Rassi was a self-serving hearsay declaration by Skelton. It would be inadmissible at trial, therefore was precluded from presentation to the grand jury. (Pen. Code, § 939.6, subd. (a)(3)(b).) The trial court correctly assessed Skelton's motion in stating "there is nothing I could put my finger on here." We agree.

■ Skelton next claims the grand jury failed to weigh all the evidence submitted to it. It is argued the grand jury could not consider exhibits—even though marked and approved by the foreman—until they were formally admitted into evidence; that it was physically impossible for the grand jurors to weigh and consider all of the 115 exhibits—numbering 5,000 pages—in a period of one and one-half hours. The grand jury heard testimony for seven days before issuing its indictment. These many documents were admitted near the close of the hearing; yet they had been the subject matter of seven days of oral testimony. Penal Code section 939.6 upholds an indictment supported by sufficient competent evidence, which includes testimony of witnesses produced and sworn before the grand jury, despite the fact the grand jury also arguably receives objectionable evidence. If it be assumed the grand jury should not have considered the 115 exhibits until formally introduced into evidence, the indictment is not defective for it is completely supported by competent evidence. (Cf., *Rideout* v. *Superior Court* (1967) 67 Cal.2d 471, 474 [62 Cal.Rptr. 581, 432 P.2d 197].)

The trial court found after "fair review" of the record, the grand jury did give consideration to the evidence as presented; it fulfilled its duty to weigh all the evidence. Skelton's motion was properly denied.

## II

### *Postindictment Preliminary Hearing*

■ Appellants assert they were denied due process of law under both the United States Constitution and the California Constitution when the trial court refused to grant them a preliminary hearing.

In *Hawkins* v. *Superior Court* (1978) 22 Cal.3d 584 [150 Cal.Rptr. 435, 586 P.2d 916], the Supreme Court held the denial of a postindict-

ment preliminary hearing deprived defendants in felony prosecutions of equal protection of the laws guaranteed by article I, section 7 of the California Constitution. This rule, however, is to be limited in its retroactive effect. As the *Hawkins* court stated: "Because of the previous reliance by the bench and bar on the validity of current postindictment procedures, the rule announced herein shall apply only to the present case and to those indicted defendants who have not entered a plea at the time this opinion becomes final. [Citation.]" (*Id.*, at p. 594.)

*Hawkins* became final on December 13, 1978. The plea by Skelton was entered on July 23, 1976. Similarly, Mack entered his plea July 23 and Curtin pled on November 29, 1976. All three defendants fell without the scope of the new rule announced in *Hawkins* v. *Superior Court, supra*, 22 Cal.3d 584, 594. (See also *Sherwood* v. *Superior Court* (1979) 24 Cal.3d 183, 186 [154 Cal.Rptr. 917, 593 P.2d 862]; *People* v. *Wiener* (1979) 91 Cal.App.3d 238, 247 [154 Cal.Rptr. 110].) The trial court properly denied the motion for a postindictment preliminary hearing.

### III

### *Motions for Severance*

■ Appellants assert the trial court erred in denying their motions for separate trials. "When two or more defendants are jointly charged with any public offense...they *must* be tried jointly, unless the court order separate trials." (Pen. Code, § 1098, italics added; *People* v. *Romo* (1975) 47 Cal.App.3d 976, 985 [121 Cal.Rptr. 684].)

The trial court exercised this discretion and concluded "much of the danger of unfairness can be avoided by providing separate counsel for defendants...proper instructions to the jury." Moreover, great weight was given to the difficulty the prosecution would encounter if separate trials were ordered. Many of the chief prosecution witnesses were from out of state.

Skelton and Curtin point to "the vices inherent in a mass trial...the danger that the jury will find one or more defendants guilty as charged because of his association with evil men;..." (*People* v. *Biehler* (1961) 198 Cal.App.2d 290, 298 [17 Cal.Rptr. 862].) This is a legitimate concern, yet the Legislature has placed discretion in the trial court to take

such steps as necessary to obviate this problem. The record reflects the trial court felt measures short of severance were adequate.

Skelton admits the joinder of offenses satisfied the requirement "'there is a common element of substantial importance in their commission'" (*In re Pearson* (1947) 30 Cal.2d 871, 874 [186 P.2d 401]) but suggests the consolidation of grand theft with the conspiracy count prejudiced him because of the relaxed hearsay rule of Evidence Code section 1223 applicable by virtue of the conspiracy charged. He posits the real danger was conviction solely due to his association with coconspirators.

The trial court weighed this factor but concluded the preference for joint trials prevailed over the complication of issues. There is no factual base to conclude the court abused its discretion. (*People* v. *De La Plane* (1979) 88 Cal.App.3d 223, 251 [151 Cal.Rptr. 843].)

Reliance on *Castro* v. *Superior Court* (1970) 9 Cal.App.3d 675 [88 Cal.Rptr. 500], is misplaced. *Castro* involved the peculiar fact of First Amendment infringement. Considerations of free speech and association are absent here, thus making *Castro* reasoning irrelevant. (*Id.*, at p. 682.)

Next Curtin asserts "*Aranda* error" arose from the denial of separate trials. In *People* v. *Aranda* (1965) 63 Cal.2d 518, 530-531 [47 Cal.Rptr. 353, 407 P.2d 265], the Supreme Court held where the prosecution proposes to introduce into evidence an extrajudicial statement of one defendant that implicates a codefendant, the trial court must adopt one of the three described procedures. The ameliorative procedures mandated by *Aranda* have no relevance here. Curtin sets forth no "confession" of a codefendant implicating him. His claim of "prejudice" is not supported by a single reference to the record. Skelton's claim of error on this ground is equally specious. The fact that his defense was diametrically opposed to that of Mack and Curtin does not require a severance midstream. (*People* v. *Simms* (1970) 10 Cal.App.3d 299, 306 [89 Cal.Rptr. 1].) In any event the motions for severance were thoroughly explored by the trial court. The complex interrelation between the defendants as well the crimes committed favor joinder, not sever-

ance. A denial of the motion will be disturbed on appeal only for abuse of discretion resulting in substantial prejudice to a defendant. (*People* v. *Duane* (1942) 21 Cal.2d 71, 78 [130 P.2d 123].) "Where the consolidation meets the test of joinder," as it does here, "the difficulty of showing prejudice from denial of severance is so great that the courts almost invariably reject the claim of abuse of discretion." (Witkin, Cal. Criminal Procedure, p. 288, quoted with approval in *People* v. *Rhoden* (1972) 6 Cal.3d 519, 525, fn. 2 [99 Cal.Rptr. 751, 492 P.2d 1143].) We find no abuse of discretion.

## IV

### *Motion to Suppress*

Appellants next contend the seizure of corporate records by subpoena duces tecum (Corp. Code, § 25531) was illegal; the materials taken should have been suppressed.

Stanley Iezman, an attorney with the enforcement division, Commissioner of Corporations, directed the issuance of 16 subpoenas duces tecum addressed to various RGW entities.

The San Diego District Attorney's office was notified of the investigation and due to the large volume of records to be seized—exceeding storage capacity of Iezman's office—arrangements were made to store the records at the San Diego District Attorney's office.

After inventory by the Department of Corporations agent in Los Angeles, approximately 79 cartons of material were placed in storage at the San Diego District Attorney's office. The Department of Corporations agents made continuing use of these documents during dozens of visits to San Diego.

The trial court denied the Penal Code section 1538.5 motion finding there was no conspiratorial subterfuge by the district attorney to utilize the Corporations Commission to avoid the interposition of a neutral magistrate. The Department of Corporations acted in good faith after a formal investigation by the Corporations Commission was underway. Defendants' cooperation and failure to object waived any objection to the constitutionality of the subpoena.

Appellants argue that the Department of Corporations, while having authority to investigate, had no authority to retain and turn records over to the district attorney absent the commissioner's authorization and that the use of the subpoena duces tecum amounted to an unconstitutional search and seizure.

Corporations Code section 25533 expressly authorizes the Commissioner of Corporations to "refer such evidence" of violation to the district attorney of the county in which the violation occurred. While the statutes refer to the "Commissioner" yet it is "the office of the Commissioner" or the "Department" that executes the statutory duties on behalf of the commissioner. (*St. John* v. *Superior Court* (1960) 178 Cal.App.2d 794, 797 [3 Cal.Rptr. 535, 84 A.L.R.2d 415]; *People* v. *Park* (1978) 87 Cal.App.3d 550, 569, 570 [151 Cal.Rptr. 146].)

Concerning the constitutionality of such subpoenas, the California Supreme Court has concluded: "There is no constitutional objection to a system under which the heads of departments of government may compel the production of evidence for purposes of investigation, without instituting formal proceedings against the one from whom the evidence is sought or filing any charges against him.... Insofar as the prohibition against unreasonable searches and seizures can be said to apply at all it requires only that the inquiry be one which the agency demanding production is authorized to make, that the demand be not too indefinite, and that the information sought be reasonably relevant. [Citations.]" (*Brovelli* v. *Superior Court* (1961) 56 Cal.2d 524, 529 [15 Cal.Rptr. 630, 364 P.2d 462].)

Appellants uncritically equate serving a subpoena duces tecum with entering an office and forcibly seizing papers found there. When police unjustifiably enter an office and seize papers, privacy is irrevocably destroyed. But the issuance and service of a subpoena do not, by themselves, invade the private papers of anyone. If the person having custody of the papers believes the subpoena is defective, and he is unwilling to waive the defect by his voluntary compliance, he may make a motion to quash the subpoena (see *Southern Pac. Co.* v. *Superior Court* (1940) 15 Cal.2d 206, 209 [100 P.2d 302, 130 A.L.R. 323]) or he may refuse to comply and present his excuse when enforcement is attempted against him (*C. S. Smith Met. Market Co.* v. *Superior Court* (1940) 16 Cal.2d 226 [105 P.2d 587]).

Where the custodian chooses to disregard defects in the process, and comes forward with the papers and records, Fourth Amendment rights have not been invaded. (*People* v. *Warburton* (1970) 7 Cal.App.3d 815, 824 [86 Cal.Rptr. 894]; *People* v. *Park* (1978) 87 Cal.App.3d 550, 570 [151 Cal.Rptr. 146].)

Here Mack and Skelton received subpoenas and were told the materials might be reviewed by the district attorney, yet neither objected. In fact Skelton made arrangements when the documents could be obtained. There is no duty to inform a party of the right to refuse or move to quash a subpoena before a waiver can occur. (*People* v. *Park, supra,* 87 Cal.App.3d 550, 570; *People* v. *Warburton, supra,* 7 Cal.App.3d 815, 824; cf., *People* v. *Duren* (1973) 9 Cal.3d 218, 241 [107 Cal.Rptr. 157, 507 P.2d 1365].) Denial of the motions to suppress was proper.

## V

### *Rights Against Self-incrimination*

█ Skelton next asserts the evidence taken by the use of the corporate subpoenas was obtained and used in violation of his rights against self-incrimination. Skelton relies in the first instance on Corporations Code section 25531, subdivision (e),[4] claiming his compliance with subpoenas shields him from prosecution based on the yielded documents. Section 25531, subdivision (e), grants immunity to a party who "after validly claiming his privilege" has been compelled to produce evidence or testify. (*People* v. *King* (1967) 66 Cal.2d 633, 642 [58 Cal.Rptr. 571, 427 P.2d 171].) The statute clearly requires the privilege be claimed if immunity is to be obtained. Skelton cooperated with authorities, claimed no privilege before surrendering the materials.

---

[4]"No person is excused from attending and testifying or from producing any document or record before the commissioner, or in obedience to the subpoena of the commissioner or any officer designated by him, or in any proceeding instituted by the commissioner, on the ground that the testimony or evidence (documentary or otherwise) required of him may tend to incriminate him or subject him to a penalty or forfeiture; but no individual may be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter, or thing concerning which he is compelled, after validly claiming his privilege against self-incrimination, to testify or produce evidence (documentary or otherwise), except that the individual testifying is not exempt from prosecution and punishment for perjury or contempt committed in testifying."

Moreover, on these facts Skelton has no valid Fifth Amendment privilege against self-incrimination. No testimonial communications were compelled, only corporate records were sought. (*Bellis* v. *United States* (1974) 417 U.S. 85, 92 [40 L.Ed.2d 678, 686, 94 S.Ct. 2179, 2184].) The Fifth Amendment protects a person "only against being incriminated by his own compelled *testimonial* communications." (*Fisher* v. *United States* (1976) 425 U.S. 391, 409 [48 L.Ed.2d 39, 55, 96 S.Ct. 1569, 1580], italics added; see also *Andresen* v. *Maryland* (1976) 427 U.S. 463, 471-473 [49 L.Ed.2d 627, 636-638, 96 S.Ct. 2737, 2744]; *Matter of Grand Jury Empanelled Feb. 14, 1978* (3d Cir. 1979) 603 F.2d 469, 476-477.)

## VI

### *Right to Cross-examine and Confront*

■ Skelton claims he was denied his right to confront and cross-examine witnesses Dorothea Clyne and Jill Silver. Near the end of trial, the attorneys stipulated in open court that Clyne had made a certain statement to Investigator Rassi and Silver had given certain testimony before the grand jury. Skelton's attorney responded to the proposed stipulation, "So stipulated your Honor from Mr. Skelton." Skelton was present, made no objection. Both Clyne and Silver had previously testified at trial and had been extensively cross-examined by Skelton's attorney. Any reference to Skelton in the stipulated portion of Silver's testimony was minimal.

The rights to confront and cross-examine witnesses are fundamental procedural rights. (*Barber* v. *Page* (1968) 390 U.S. 719 [20 L.Ed.2d 255, 88 S.Ct. 1318]; *Jennings* v. *Superior Court* (1967) 66 Cal.2d 867 [59 Cal.Rptr. 440, 428 P.2d 304].) These rights, however, may be waived. (*Boykin* v. *Alabama* (1969) 395 U.S. 238 [23 L.Ed.2d 274, 89 S.Ct. 1709].) In *In re Mosley* (1970) 1 Cal.3d 913 [83 Cal.Rptr. 809, 464 P.2d 473], the Supreme Court held a stipulation entered into by counsel to submit the case on the transcript of the preliminary examination foregoing in toto a jury trial was tantamount to a plea of guilty. Yet the Supreme Court upheld Mosley's conviction because the stipulation was entered in his presence without objection and without objection at time of the finding of guilt. (*Id.*, at pp. 924-925.)

Here, however, the facts do not approach a total waiver of jury trial by stipulation as in *In re Mosley, supra.* The stipulated testimonies

were only a minute portion of the testimony by witnesses who had testified and had been extensively cross-examined. We find no error.

## VII

### *Securities Instruction Challenge*

Appellants contend the trial court prejudicially erred in refusing to permit the jury to determine whether the RGW investment programs were in fact securities.[5] Instead the court, over defense objection, instructed the jury: "You are instructed that interests in the programs known as the 10 or 11% Option Limited Partnership Program, the Palmdale 4-plex Joint Venture Program, the PAMCO Dairy Program, the Dairivest Limited Partnership Program, the RGW Warehousing Joint Venture Program and the Palmdale Medical Complex Joint Venture Program are securities for the purpose of these instructions."

■ Whether a written agreement constitutes a security within the corporate security law is a question of law and reviewable as such by an appellate court. (*People* v. *Miller* (1961) 192 Cal.App.2d 414, 418 [13 Cal.Rptr. 260]; *People* v. *Rankin* (1959) 169 Cal.App.2d 150, 160 [337 P.2d 182]; *People* v. *Marvin* (1941) 48 Cal.App.2d 180, 193 [119 P.2d 413]; *People* v. *Dutton* (1940) 41 Cal.App.2d 866, 872-873 [107 P.2d 937]; *People* v. *Rubens* (1936) 11 Cal.App.2d 576, 587 [54 P.2d 98,

---

[5]A security as defined in Corporations Code section 25019 "means any note; stock; treasury stock; membership in an incorporated or unincorporated association; bond; debenture; evidence of indebtedness; certificate of interest or participation in any profit-sharing agreement; collateral trust certificate; preorganization certificate or subscription; transferable share; investment contract; voting trust certificate; certificate of deposit for a security; certificate of interest or participation in an oil, gas or mining title or lease or in payments out of production under such a title or lease; any beneficial interest or other security issued in connection with a funded employees' pension, profit sharing, stock bonus, or similar benefit plan; or, in general, any interest or instrument commonly known as a 'security'; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing. All of the foregoing are securities whether or not evidenced by a written document. 'Security' does not include: (1) any beneficial interest in any voluntary inter vivos trust which is not created for the purpose of carrying on any business or solely for the purpose of voting, or (2) any beneficial interest in any testamentary trust, or (3) any insurance or endowment policy or annuity contract under which an insurance company admitted in this state promises to pay a sum of money (whether or not based upon the investment performance of a segregated fund) either in a lump sum or periodically for life or some other specified period, or (4) any franchise subject to registration under the Franchise Investment Law, or exempted from such registration by Section 31100 or 31101 of that law."

1107]; *People* v. *McCalla* (1923) 63 Cal.App. 783, 789 [220 P. 436]; *S.E.C.* v. *Howey Co.* (1946) 328 U.S. 293, 299-300 [90 L.Ed. 1244, 1249-1250, 66 S.Ct. 1100, 1103, 163 A.L.R. 1043].)

The *Dutton* court, *supra*, faced with the identical contention made here, held: "Section 19 of article VI of the Constitution of California provides that 'The court may instruct the jury regarding the law applicable to the facts of the case...'Pursuant to the foregoing provision, the trial court was therefore authorized to determine as a matter of law and to instruct the jury regarding the legal effect of the terms of the challenged documents....Whether or not the documents in question constituted securities was not a question of fact, but one of law, upon which the court alone could pass." (*People* v. *Dutton, supra*, 41 Cal. App.2d 866, 872-873.)

"An investment contract thus came to mean a contract or scheme for 'the placing of capital or laying out of money in a way intended to secure income or profit from its employment.' [Citation.] This definition was uniformly applied by state courts to a variety of situations where individuals were led to invest money in a common enterprise with the expectation that they would earn a profit solely through the efforts of the promoter or of some one other than themselves. [Fn. omitted.]" (*S.E.C.* v. *Howey Co., supra*, 328 U.S. 293, 298 [90 L.Ed. 1244, 1249], citing *People* v. *White* (1932) 124 Cal.App. 548 [12 P.2d 1078] and *Moore* v. *Stella* (1942) 52 Cal.App.2d 766 [127 P.2d 300], in support of this definition.) And at page 300 the court held: "Thus all the elements of a profit-seeking business venture are present here. The investors provide the capital and share in the earnings and profits; the promoters manage, control and operate the enterprise. It follows that the arrangements whereby the investors' interests are made manifest involve investment contracts, regardless of the legal terminology in which such contracts are clothed. The investment contracts in this instance take the form of land sales contracts, warranty deeds and service contracts which respondents offer to prospective investors. And respondents' failure to abide by the statutory and administrative rules in making such offerings, even though the failure result from a bona fide mistake as to the law, cannot be sanctioned under the Act." The court then held "[t]he transactions in this case clearly involve investment contracts as so defined. (*Id.*, at p. 299 [90 L.Ed. at p. 1250].)

█ Whether a particular document—or several documents construed together—(*People* v. *Rankin* (1959) 169 Cal.App.2d 150, 161

[337 P.2d 182]; *El Claro Oil etc. Co.* v. *Daugherty* (1936) 11 Cal. App.2d 274, 281 [53 P.2d 1028, 55 P.2d 488]) are to be considered as a "security" within the meaning of the statutory definition is to be determined on a case by case approach. (*People* v. *Syde* (1951) 37 Cal.2d 765, 768 [235 P.2d 601].)

As was said in *People* v. *Hoshor* (1949) 92 Cal.App.2d 250, 253 [206 P.2d 882]: "Whether any particular instrument is a security must be determined by its own contents and language. No definition has yet been formulated that will apply to every case. *Courts must look through form to the substance and determine whether the transaction contemplates the conduct of an enterprise by persons other than the investor who is to share in its profits and finally in its proceeds.*" (Italics added.)

## VIII

### *The Conspiracy Pleadings*

■ Mack asserts the trial court erred in failing to sustain his objection to the conspiracy pleadings as it was indefinite. He contends the People failed to specify the objects and scope of conspiracy and thereby denied him due process.

Here the scope of conspiracy was limited in time from June 1, 1972, to December 1, 1974. The indictment specified the purpose of the conspiracy—to commit grand theft. Furthermore, the grand jury transcript explicitly described the underlying facts, the overt acts supporting the charge. Upon this backdrop, the court exercised sound discretion (*People* v. *Jordan* (1971) 19 Cal.App.3d 362, 371 [97 Cal.Rptr. 570]) and determined the charge of conspiracy was sufficiently definite to provide notice. In "our simplified forms of criminal pleading it is not necessary to detail the act which each of the conspirators is to perform. . . . The accused is not entitled to the description of the 'particular circumstances thereof' which he may get from his copy of the testimony given before the grand jury. . . and furnished to him." (*People* v. *Gordon* (1945) 71 Cal.App.2d 606, 610-611 [163 P.2d 110]; see also *People* v. *Codina* (1947) 30 Cal.2d 356, 359 [181 P.2d 881].) We find no abuse of discretion, no miscarriage of justice arising from these pleadings. (*People* v. *Gordon, supra,* 71 Cal.App.2d 606, 611.)

## IX

### *Violation of Evidence Code Section 1101*

Curtin and Mack contend the trial court violated Evidence Code section 1101 in admitting evidence of transactions occurring in the 18-month period before the charged conspiracy commenced.

The challenged evidence was not admitted to establish the character of codefendants Mack and Curtin in violation of Evidence Code section 1101, subdivision (a). Rather, the investment history was relevant to grand theft and securities fraud counts. "A conspiracy may be established by . . . circumstantial evidence. The evidence may cover many transactions, extend over a long period of time, and show acts which occurred some time before the alleged formation of the conspiracy, as long as the facts shown have some bearing or some tendency to prove the ultimate facts in issue." (*People* v. *Calhoun* (1958) 50 Cal.2d 137, 144 [323 P.2d 427].) Thus, relevancy, not an arbitrary time period, is the test. (Cf., *People* v. *Collier* (1931) 111 Cal.App. 215 [295 P. 898].) The number of cows present attributed to these earlier investments circumstantially proved codefendants conspired to commit grand theft in the later investment agreements.

The challenged evidence was admissible to establish motive, intent, preparation, plan as well as knowledge. (Evid. Code, § 1101, subd. (b); *People* v. *Rosoto* (1962) 58 Cal.2d 304, 330 [23 Cal.Rptr. 779, 373 P.2d 867].) The trial court did not abuse its discretion in admitting the evidence. (*People* v. *Matson, supra,* 13 Cal.3d 35, 40.)

Nor does Mack's statute of limitations argument have merit. It is the last overt act in furtherance of the conspiracy that triggers the running of the statute of limitations. (*Bompensiero* v. *Superior Court* (1955) 44 Cal.2d 178, 184 [281 P.2d 250].)

## X

### *Conspiracy Instructions*

Curtin requested a special instruction to require the jury to unanimously agree as to which act or acts of theft the defendants had specific intent to agree to commit. Such instruction would also have required a special verdict form reflecting this finding.

The court refused this instruction but charged the jury in the language of CALJIC No. 6.10: "A conspiracy is an agreement entered into between two or more persons with the specific intent to commit the public offense of grand theft and with the further intent to commit such offense, followed by an overt act committed in this state by one or more of the parties for the purpose of accomplishing the object of the agreement. Conspiracy is a crime.

"In order to find a defendant guilty of conspiracy, in addition to proof of the unlawful agreement and specific intent, there must be proof of the commission of at least one of the overt acts alleged in the Indictment. It is not necessary to the guilt of any particular defendant that he himself committed the overt act, if he was one of the conspirators when such act was committed." Further, the jury was instructed (CALJIC No. 17.50): "In order to reach a verdict, all 12 jurors must agree to the decision."

Appellants argue CALJIC No. 17.50 does not adequately inform the jury of the requirement they be unanimous in finding the commission of an overt act during the period of the conspiracy and unanimous in attributing specific intent to commit grand theft during the period of the individual's participation in the conspiratorial agreement.

The crime of conspiracy cannot be found by the jury, unless there is proof beyond a reasonable doubt that one or more of the conspirators committed an overt act in furtherance of the objective of the conspiracy. (Pen. Code, § 184; *People v. Williams* (1979) 97 Cal.App.3d 382, 392 [158 Cal.Rptr. 778]; *Feagles v. Superior Court* (1970) 11 Cal. App.3d 735, 739 [90 Cal.Rptr. 197].) However, such rule does not require the giving of the instruction requested by Curtin or special verdict forms to indicate which overt act(s) were proved to the requisite degree.

The federal Court of Appeals in *United States v. Armone* (2d Cir. 1966) 363 F.2d 385, 398, rejected a similar contention, stating: "As for Armone and Grammauta's argument, the court's charge that 'your task will be to find beyond a reasonable doubt that at least one of the overt acts 10 and 11, in fact, took place....Now, if you find beyond a reasonable doubt that at least one of these two overt acts, 10 and 11, was committed,' coupled with his instruction that the verdict be unanimous, adequately answers this objection. 'You' and 'your' obviously refer to the jury as a body; any supposition that the jurors would take the

instructions to mean that they can fragment their findings on the elements of the offense (taking overt acts *arguendo* to be 'elements' in this context) is strained conjecture."

The instructions here given clearly specify the elements of the crime of conspiracy including the requirement as one of those elements of "an overt act" and requires, before there can be any finding of guilt of conspiracy, "in addition to proof of the unlawful agreement and specific intent, there must be proof of the commission of at least one of the overt acts alleged . . . ." These most specific instructions must be viewed in conjunction with the unqualified requirements that proof be made beyond a reasonable doubt as to each element of an offense and that the verdict be unanimous. There is no inadequacy in the instruction given. Curtin's argument is but "strained conjecture."

## XI

### *The Two Conspiracy Contention*

Curtin contends the trial court was required to instruct the jury they were to determine whether there was *one* or *two* conspiracies and "you will not consider any such acts or declarations against any defendant unless you find, beyond a reasonable doubt, that the person doing the act, making the declaration, was a member of the same conspiracy as was that defendant." If multiple conspiracies in fact existed, the latter instructions were required.

The case of *Kotteakos* v. *United States* (1946) 328 U.S. 750 [90 L.Ed. 1557, 66 S.Ct. 1239], distinguishes between single and multiple conspiracies. In *Kotteakos*, a number of different defendants arranged illegal government loans through a single broker. Although there was a single codefendant involved in all of the transactions, the other party to the agreement was always different. The court rejected the government's theory of a single overall conspiracy, stating (at pp. 754-755 [90 L.Ed. at p. 1561]): "In many cases the other defendants did not have any relationship with one another, . . . The proof therefore admittedly made out a case, not of a single conspiracy, but of several, notwithstanding only one was charged in the indictment." However, the later case of *Blumenthal* v. *United States* (1947) 332 U.S. 539, 558 [92 L.Ed. 154, 169, 68 S.Ct. 248], distinguished *Kotteakos*, pointing out that none of the agreements in *Kotteakos* "were tied together as stages in the formation of a larger all-inclusive combination, all directed to

achieving a single unlawful end or result. On the contrary each separate agreement had its own distinct, illegal end . . . . There was no drawing of all together in a single, over-all, comprehensive plan." (See *People v. Elliott* (1978) 77 Cal.App.3d 673, 685 [144 Cal.Rptr. 137].)

And as the United States Court of Appeals for the Ninth Circuit in *United States* v. *Hobson* (1975) 519 F.2d 765, 774-775, explained: "The doctrine enunciated in *Kotteakos* . . . however, has been applied primarily in those cases where the evidence reveals the likelihood that one or more of the defendants did not know or had not agreed to the overall goals of the other co-conspirators, . . . The fact that he may not have known *all* of the purposes involved and *all* of the co-conspirators is irrelevant. Once a conspiracy is shown, only slight evidence is required to link any one defendant to the conspiracy." (See also *People* v. *Hess* (1951) 104 Cal.App.2d 642, 670-671 [234 P.2d 65].) Reliance upon *Kotteakos* v. *United States, supra*, 328 U.S. 750, is inappropriate.

▇ The foregoing authorities compel this conclusion: The test is whether there was one overall agreement among the various parties to perform various functions in order to carry out the objectives of the conspiracy. If so, there is but a single conspiracy. (*United States* v. *Hobson, supra*, 519 F.2d 765, 775.)

▇ Here the evidence clearly shows one overall scheme. All of the investment schemes operated under the umbrella of RGW brought in funds which were disbursed according to the immediate need of that corporation. It is true that the co-conspirators performed different functions, yet their activities overlapped into many of the different programs. While the conspirators engaged in a variety of functions, a series of "programs," there was but one overall scheme.

Moreover, the record reflects the close substantive relationship between the various RGW programs. Funds from investments were diverted and used interchangeably wherever a program demanded. Skelton, Mack and Curtin were active at the forefront of each of these programs. The jury was properly instructed on the single conspiracy theory.

If we make the fanciful assumption the evidence warranted consideration of the two conspiracy assertions (*People v. Flannel* (1979) 25 Cal.3d 668, 684, fn. 12 [160 Cal.Rptr. 84, 603 P.2d 1]), yet the failure to instruct does not require reversal. A judgment will not be reversed on

the ground that two separate conspiracies were charged as one, unless the appellant shows that he was prejudiced thereby. (*People* v. *Elliot, supra,* 77 Cal.App.3d 673, 685; *Berger* v. *United States* (1935) 295 U.S. 78 [79 L.Ed. 1314, 55 S.Ct. 629].) Curtin has shown no prejudice from any failure to plead separate conspiracy counts.

## XII

### *Instruction Error—CALJIC No. 2.03*

■ Mack contends error in charging the jury thus: "If you find that before this trial a defendant made false or deliberately misleading statements concerning the charge upon which he is not being tried, you may consider such statements as a consciousness of guilt but it is not sufficient in itself to prove guilt. The weight to be given to such a circumstance and its significance, if any, are matters for your determination." (CALJIC No. 2.03.) Mack claims no factual basis existed to authorize giving this instruction. (*People* v. *Hannon* (1977) 19 Cal.3d 588, 598 [138 Cal.Rptr. 885, 564 P.2d 1203].)

The jury, however, was also instructed to "disregard any instruction which applies to a state of facts which you determine does not exist."

If we assume error, yet such misinstruction would not dictate reversal unless defendant shows prejudice resulting. (*People* v. *Flannel, supra,* 25 Cal.3d 668, 686.) None is here shown; reversal is not warranted. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

## XIII

### *Sufficiency of Evidence Supporting Curtin's Convictions*

■ Curtin ventures alone when he asserts there was insufficient evidence to convict him on any theft count or on any counts in the indictment. He asserts the recent United States Supreme Court decision in *Jackson* v. *Virginia* (1979) 443 U.S. 307 [61 L.Ed.2d 560, 99 S.Ct. 2781], has altered California's "substantial evidence" rule, imposed a greater burden on reviewing courts. The California Supreme Court (*People* v. *Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738]) analyzed *Jackson* v. *Virginia, supra,* and derived this standard: "[T]he court must review the whole record in the light most favorable to the judgment below to determine whether it discloses sub-

stantial evidence...such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." We approach Curtin's contention mindful of these rules.

Curtin asserts he was simply an attorney with expertise in the area of tax shelters; that his association with the RGW group and its various "programs"—particularly the dairy cow and allied operations—was to provide individual taxpayers with "tax shelters." He points the finger of responsibility at his codefendants but at the same time asserts the United States' sale of grain to Russia caused the gross losses to the many investors. He flatly asserts he lacked the requisite intent to commit any of the offenses charged against him.

The record in this case bristles with circumstantial evidence—for the most part uncontradicted—much from Curtin's statements on direct and cross-examination—that points to the requisite guilty intent—and beyond any reasonable doubt when admeasured by a rational trier of fact. The PAMCO dairy program was developed (commencing Oct. 1971) in large part under Curtin's direction and participation. He participated in procuring the first investment. He was one of the original five owners. He had detailed knowledge of the "program" for leasing the cows as well as operational details such as number of cows, from whom and to whom leased, intimate details of the costs involved in feeding of cows, of sale of milk, etc. He knew the investors' money was to be deposited in a "trust account" and "returned if anything went wrong."

This PAMCO money was to be used to purchase feed and secure the lease of cows. In fact, rising feed costs, excess management costs, diversion of funds to unauthorized purposes, depleted the investment funds. Investors were not informed a $700 *commission* was taken from their committed funds. Similarly, North American Farms and Ranches (NAFAR), a defunct corporation in the RGW stable of corporations, operated as a middleman, charged the investors 10 percent commission to acquire cows for the *lessor* (Dolsen) who in turn leased the cows to the investors. Curtin received $9,000 as his share of these commissions. From investors' monies, Curtin received a retainer from RGW of $2,200 a month from May 1973 to March 1974 and had access to a "slush" fund for expenses. His offices were in the RGW suite. Curtin had a motive in keeping new investment funds flowing into the dairy program. He was a guarantor on various loans to PAMCO.

The total number of cows leased by Dolsen to PAMCO was 1,500. This was the highest count of cows on the dairy facilities. Yet an audit of the PAMCO records revealed "leases" of 2,750 cows to investors. Curtin was knowledgeable of these facts.

In August 1973, the past due accounts for feed bills totalled $150,000. A lawsuit was pending for $100,000 past due on the Western Stockman feed bill. George Christoffersen, PAMCO-Dairivest foreman/manager, repeatedly asked Curtin for money to pay the dairy bills. During 1973, Curtin went to the dairies in Idaho once a month and talked with Christoffersen once or twice a month. Reports from the dairies were sent to Curtin, and he discussed the feed bills and expenses. Curtin made trips to the dairies as late as April 1974. Curtin was aware in late 1973 that the dairies were short cows and discussed this with Ryan a number of times.

In May 1973, ownership of PAMCO was transferred entirely to RGW and on August 30, 1973, PAMCO sold its assets to Dairivest, another corporation in the RGW family. The purpose of this transaction was to take advantage of an opportunity to double the dairies' milk quota.[6] *The sole asset of PAMCO, the milk quota, was in Curtin's name as an individual.* He turned it over to Dairivest.

The PAMCO management agreement called for funds to be returned to investors within 30 days if leases of cows were not implemented. *This was not done.* Curtin's explanations on the basis of language in the documents (drawn by him) for this failure are sufficient to give any rational juror a strong suspicion of his guilty knowledge and intent to steal.

After the transfer of PAMCO to Dairivest, Curtin protests he had no more involvement in the dairies or programs, yet as late as the fall of 1973, Curtin told insurance salesman Reed Millar, to induce him to sell the "program," the $6,850 investment was to buy feed for the investors' specific cows and the money would be returned within 30 days if the cows were not placed.

Curtin was a signator on the PAMCO checking account and continued to sign checks through August 1974. He claims he signed checks in

---

[6]The milk quota allowed a dairy to sell a certain amount of milk at a fixed base price to the milk cooperative. Excess milk was sold at a lower price.

blank—did not know of the (mis)use of the proceeds. Curtin signed most of the cow leases and management agreements on behalf of PAMCO through February of 1974. In December 1973, Dairivest investor funds of $18,500 were sent directly to the Idaho dairies on two occasions at the direction of Curtin.

Curtin's direct involvement in the PAMCO investments is reflected in the letters he sent to the investors and his signature on the management agreements and the purported leases of nonexistent cows. A rational jury could find a callous disregard for the truth in a letter Curtin sent to Mr. Lloyd in *May 1974* telling him his investment was as secure as any investment anywhere.

The seven Dairivest theft counts are proved as to Curtin beyond any reasonable doubt. Curtin not only drafted the Dairivest program but also signed checks on the Dairivest account through February 1974. The "brochure" used to entice investors represented the general partner of the Dairivest Limited Partnership was to be "Cow Palace Limited" of Yakima, Washington, a dairy to be operated by Dairivest Farms. In fact, negotiations to purchase Cow Palace Limited broke down in September 1973 and it was never acquired. Late in the fall of 1973, Curtin told Reed Millar (to induce him to peddle the "programs") that RGW *had purchased* Cow Palace a year earlier. He further represented the money invested would be held in escrow until all limited partnerships were purchased. On trial Curtin contended the cows were *not to be placed on a farm but on a lease*—paper cows on a paper lease. In fact, there were no limited partnerships formed, no certificates filed, no cows placed, and the money received from the investors was misused—embezzled—spent for other RGW purposes.

Curtin's intimate connection with the seven Dairivest thefts charged is reflected by the letters he sent to the investors and his signature on the articles of limited partnership. In August 1974, Curtin wrote letters to Dairivest investors thanking them and assuring them they would get an attractive return and maximum security from their investment.

The Warehousing program was the final program resulting in grand theft convictions for Curtin. As late as March 1974, Curtin and Skelton maintained the investments received in the Warehousing program would be accumulated until a $60,000 fund was obtained. The money was then to go to a farmer as a down payment for the purchase of grain or hay. These representations were false. The money went into the

Dairivest account and no hay or grain was purchased for warehousing on the dairies. Curtin drafted the Warehousing program.

In May 1974, Curtin wrote a letter to Mr. Baker giving the investment advantages and tax consequences of Warehousing and telling him it was a highly attractive situation for him.

Curtin's responses on both direct and cross-examination were often less than candid, frequently evasive in nature. He stated the costs were a "guess" on a profit and loss statement copied from his own handwriting. Curtin's attempt at explanation of *his* patently false "footnote 10" to the consolidated balance sheet—sent to investors—is in itself sufficient to warrant a conviction for fraud, theft by false pretenses.

Curtin's description of the "Sunnybrook" dairy venture in August 1973 implies cows were in place on the farm being milked, etc.; that monies had been spent for *feed*—for nonexistent cows. Yet on trial he made the baldfaced assertion this was not a misrepresentation of fact but a "projection"—shades of "nonoperative" Watergate facts.

In sum, there is a mountain of circumstantial evidence that points unerringly to a dishonest, thieving intent on Curtin's part extending over many years of activities. In broad outline Curtin directly participated in a scheme using multiple corporate and business entities in a kind of corporate shell game. False documents, false representations were used to obtain nearly $2 million of investors' dollars followed by misuse—embezzlement of the funds received. While there is no "smoking gun" or a percipient witness to Curtin carrying away a barbeque set or holding a gun on a bank teller, yet grand theft takes many forms. The record here exudes evidence, competent and believable to prove Curtin participated in, aided and abetted in theft by false pretenses, theft by embezzlement as he was charged and properly convicted. There is no merit in his contention.

Finally, that same sufficiency of the evidence supporting the grand theft charges in turn sustains the convictions under Corporations Code sections 25401 and 25541. As Curtin concedes, specific intent to defraud, to steal under Corporations Code parallels that requirement under Penal Code section 487, subd. 1. (Cf., *People* v. *Brady* (1969) 275 Cal.App.2d 984, 996 [80 Cal.Rptr. 418].) Mack's contentions are equally untenable.

## XIV

### *Exempt Securities*

 Next appellants' focus turns to section 25110 of the Corporations Code making it "unlawful for any person to offer or sell in this state any security in an issuer transaction...unless such sale has been qualified...or unless such security or transaction is exempted under chapter 1 (commencing with section 25100) of this part." It is argued section 25110 must be read in conjunction with the general criminal charging law of Corporations Code section 25540 requiring *willful* violation. Curtin asserts his conduct was not willful because he acted in belief the dairy and feed tax shelter programs were exempted from Corporations Code section 25110 by section 25102.

Corporations Code section 25102 exempts "any offer or sale, in a transaction *not involving any public offering*, of any bona fide general partnership, joint venture, or limited partnership interest...." (Subd. (f); italics added.) As PAMCO, Dairivest Ltd. and Warehousing were either general or limited partnerships or joint ventures, Curtin insists the decisive issue is whether the prosecution proved these programs were "public offerings."

 The determinative factors indicating a "public offering" include: (1) the number of offerees; (2) the relationship of the offerees to each other; (3) the relationship between the issuers and the offerees; (4) the size of the offerings; (5) the manner of the offerings; and (6) the character of the security offered. (*People* v. *Humphreys* (1970) 4 Cal. App.3d 693, 697 [84 Cal.Rptr. 496].) In addition, the ease with which the security may be transferred from original purchasers and the fact the particular persons affected needed the protection of the corporate securities law are important considerations. (*Id.*, at pp. 700-701.)

The jury was properly instructed on the guidelines to be used to determine the existence of a public offering. Defendants had the burden of proving an exemption. (Corp. Code, § 25163; *People* v. *Park, supra*, 87 Cal.App.3d 550, 566 "Before a judgment of conviction may be reversed for insufficiency of the evidence, it must clearly appear that on no [rational] hypothesis whatever is there sufficient substantial evidence...." (*People* v. *Humphreys, supra*, 4 Cal. App.3d 693, 697; *People* v. *Reyes* (1974) 12 Cal.3d 486, 496-497 [116 Cal.Rptr. 217, 526 P.2d 225].)

Here Curtin's attack on sufficiency lacks specificity. ▮▮▮ In fact, considering each factor deemed relevant for finding a public offering, the supporting evidence is overwhelming. No limit was placed on the number of persons who could invest in the PAMCO program, nevertheless Curtin claimed because it was offered to a limited number it need not be qualified. There appears no relationship between offerees, nor between offerees and issuer, except to the extent some investors in the dairy program were also insurance customers of RGW. "The fact that the investors are relative strangers to the issuer suggests a public offering." (*People* v. *Humphreys, supra*, 4 Cal.App.3d 693, 698.)

Additionally, "if the initial approach was made by offeror, one may more readily infer the offer as public." (*Id.*, at p. 699.) Significantly, the offeror or his agents initiated all the instant transactions. Perhaps an even greater barometer of a public offering looks to the standing of the investors. As *People* v. *Park, supra*, 87 Cal.App.3d 550, 563, 565, emphasizes, the purpose of security law is to protect the public generally, not just skilled investors, from the imposition of fraudulent investment programs. Viewing the investors under our facts no expertise or sophistication stands out in the testimony. Most were entirely unfamiliar with RGW.

Substantial evidence supports the jury's implied finding the RGW programs were "public offerings."

A similar result is warranted as to Curtin's claim this court erred in reinstating counts 61 through 76, 80 through 83, and count 126 of the grand jury indictment. As explained in our unpublished opinion in *People* v. *Superior Court* (*Curtin*) (4 Civ. No. 16361, Mar. 22, 1977), the court invited and defendant failed timely to object to the informality of the amendment procedure. We reaffirm our earlier decision.

## XV

### *The Sentences*

Finally, Skelton and Mack contend the trial court erred in imposing multiple punishments contrary to the provisions of Penal Code section 654.

Section 654 of the Penal Code commands "an act or omission which is made punishable in different ways by different provisions of this code

may be punished under either of such provisions, but in no case can it be punished under more than one...."

Appellants in addition to being convicted on numerous counts of grand theft were found guilty of Corporations Code violations under sections 25110, 25401 and 25541. The trial court sentenced defendants to prison for the term prescribed by law on one count of grand theft and ordered the remaining substantive counts concurrent. Sentence on conviction for conspiracy to commit grand theft was stayed pending appeal and completion of sentence on remaining counts.

The question presented is whether sentence on the Corporations Code and conspiracy convictions constitutes a double punishment in light of the sentence for grand theft. The Supreme Court in *People* v. *Miller* (1977) 18 Cal.3d 873, 885 [135 Cal.Rptr. 654, 558 P.2d 552], explained: "Section 654 does not preclude multiple convictions but only multiple punishments for a single act or indivisible course of conduct. [Citation.] 'The proscription against double punishment...is applicable where there is a course of conduct which violates more than one statute and comprises an indivisible transaction punishable under more than one statute.... The divisibility of a course of conduct depends upon the intent and objective of the actor, and if all the offenses are incident to one objective; the defendant may be punished for any one of them but not for more than one.' [Citation.] In *People* v. *Beamon, supra,* 8 Cal.3d 625 [105 Cal.Rptr. 681, 504 P.2d 905], we stated that section 654 is applicable to 'limit punishment for multiple convictions arising out of either an act or omission or a course of conduct deemed to be indivisible in time *in those instances wherein the accused entertained a principal objective to which other objectives, if any, were merely incidental.*' [Citation.]"

The Attorney General concedes the application of these principles renders impermissible the sentences imposed for violation of various sections of the Corporations Code which arose out of the same course of conduct and the same underlying intent to defraud resulting in the theft convictions. The fact these sentences were concurrent provides no consolation. (*People* v. *Bailey* (1974) 38 Cal.App.3d 693, 701 [113 Cal.Rptr. 514].)

The trial court stay of sentence for conspiracy (in count 132) is also attacked by appellants. "[A] defendant cannot be punished for both a substantive offense and a conspiracy to commit it unless the con-

spiracy had an unlawful objective in addition to the commission of the substantive offense." (*In re Romano* (1966) 64 Cal.2d 826, 828 [51 Cal.Rptr. 910, 415 P.2d 798]; *In re Cruz* (1966) 64 Cal.2d 178 [49 Cal.Rptr. 289, 410 P.2d 825]; *People* v. *Richardson* (1978) 83 Cal. App.3d 853, 868 [148 Cal.Rptr. 120].) The People urge the defendants' conspiracy had far broader objectives than the grand theft counts for which sentence was imposed, yet the record reveals no more than the underlying intent to obtain investors' money charged under section 487, subd. 1. Thus, sentence for conspiracy must be stricken.

Accordingly, Skelton's sentence is modified vacating the concurrent sentences as to counts 47 through 51, 57, 68 through 89, 91 through 95, 103, 104 through 116, and 120 through 132, these counts being duplicative of punishment imposed for corresponding theft convictions. In all other respects, Skelton's sentence is affirmed. Similarly, Mack's sentence is modified striking the concurrent sentences as to counts 47 through 54, 56 through 67, 69, 70, 78 through 82, 84 through 89, 91 through 108, 110 through 120, and 122 through 132. As modified, Mack's sentence is affirmed.

Curtin's probation untainted by these defects is affirmed.

Judgments as modified are affirmed.

Brown (Gerald), P. J., and Wiener, J., concurred.

Petitions for a rehearing were denied September 11 and September 12, 1980, and appellants' petitions for a hearing by the Supreme Court were denied October 29, 1980. Mosk, J., was of the opinion that the petition of appellant Curtin should be granted.

The United States Supreme Court denied appellant Curtin's petition for writ of certiorari on February 23, 1981.