Filed 8/11/22  P. v. Hutchinson CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B306087 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA396233) |
| v. | |
| JOSEPH HUTCHINSON, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Larry P. Fidler, Judge.  Reversed with directions.

Richard Lennon and Tanya Dellaca, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah P. Hill and Steven E. Mercer, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted Joseph Hutchinson of three counts of conspiracy for his participation in various schemes employed by the Mexican Mafia within the Los Angeles County jail. On appeal, Hutchinson argues that the trial court had a sua sponte duty to instruct the jury on the issue of whether Hutchinson was a member of multiple conspiracies or one overall conspiracy to commit various crimes. We agree that the trial court erred in failing to instruct on single versus multiple conspiracies and the error was prejudicial.[1] We therefore reverse and remand for further proceedings.

## BACKGROUND

### I.     The Mexican Mafia

The Mexican Mafia is a predominantly Hispanic prison gang that exerts control over numerous street gangs whose members are currently incarcerated in Southern California's prisons and jails. It follows a vertical organizational structure with a hierarchy and chain of command. The top or "brain" of the Mexican Mafia consists of about 140 individuals who are housed in high security prisons around the country. The "body" of the Mexican Mafia consists of gang members known as Sureños and Southsiders who are from various Hispanic gangs in Southern California that, once incarcerated, put aside any gang rivalries

---

[1] Given our conclusion in this case, we need not address Hutchinson's claim that his counsel rendered ineffective assistance of counsel for failing to request the appropriate conspiracy instruction, nor do we need to address his claim that conspiracy to commit extortion is not an offense subject to the alternate penalty provision of Penal Code section 186.22, subdivision (b)(4), an issue which our Supreme Court recently decided in *People v. Lopez* (2022) 12 Cal.5th 957.

2

and pledge loyalty to the Mexican Mafia.  Southsiders engage in a variety of tasks on the Mexican Mafia's behalf, including collecting drug money, distributing narcotics, and participating in murders.  Sureños are those Southsiders who are more dedicated to the Mexican Mafia and are willing to commit violence to enhance their reputation and to gain status within the hierarchy.  To insulate its members from law enforcement, the Mexican Mafia employs women outside of the prisons and jails known as "secretarias," who relay information, launder money, and deliver drugs.

The Mexican Mafia requires all Sureños, Southsiders, Hispanic inmates, and Mexican nationals to follow a set of rules during their incarceration.  Some of the rules are mundane and govern basic hygiene and self-care requirements.  For example, every Sureño and Southsider must shower daily and workout several times per week.  Some rules require a recognition that the Mexican Mafia as the authority within the jail.  For instance, all Sureños and Southsiders must report any interracial conflict before acting out against another race.  As pertinent here, other rules ensure inmates support the Mexican Mafia as a criminal enterprise.  One such rule requires Sureños and Southsiders to report any illicit drugs that enter the jail to a Mexican Mafia representative.  Still other rules are discussed in more detail below.  Depending on the violation, breaking the rules is punishable by monetary fines, forced bouts of physical exercise, assault, and murder.

## II.   The Mexican Mafia's money-making schemes

The Mexican Mafia uses various schemes to make money for its ranking member within the Los Angeles County jail.

The Mexican Mafia requires all Southsiders to give the Mexican Mafia one-third of all drugs that are smuggled into the jail. Known as "the thirds," Southsiders must give up one-third of their drugs before they can sell the remaining two-thirds to other inmates. A Mexican Mafia member will then either sell that third to other inmates housed in high security areas or keep it for personal use. Failure to contribute to the thirds is tantamount to stealing from the Mexican Mafia and is punishable by assault or murder.

The Mexican Mafia's rules require inmates to participate in the "kitty" whereby individuals contribute items purchased from the commissary to a collection bag that a Mexican Mafia member then resells at a discount. An inmate must contribute one item to the kitty for every $15 spent at the commissary. To verify inmates' contributions to the kitty, the Mexican Mafia collects commissary receipts and records the information on a detailed ledger with the inmates' names and other identifying information.

To ensure inmates follow the rules and participate in the thirds and the kitty, the Mexican Mafia maintains hit lists of gangs and individuals who have been targeted for assault and murder. These lists are known as "green light" and "hard candy" lists. A green light list contains names of gangs and individuals targeted for assault. A hard candy list contains names of individuals targeted for murder. Once a gang or an individual has been placed on a hit list, they must pay the Mexican Mafia to be removed. Oftentimes, a Mexican Mafia member will place a gang or individual on a green light list to exact money from them regardless of compliance with the rules or contributions to the

kitty or the thirds. "[G]reen-lighting is a huge source of revenue . . . for the organization."

## III. Inmate trust accounts

Because cash is not permitted in jail, Mexican Mafia members use the jail's inmate trust account system, which allows inmates to purchase commissary items and to send and receive money from visitors. Money generated from drug sales, the kitty, and the green light and hard candy lists is deposited into the Mexican Mafia members' inmate trust accounts. Inmates' payments for drugs or the kitty are verified after corresponding receipts are mailed to a designated address or post office box.

Inmates in the Los Angeles County jail can release funds by giving a visitor a property release slip with their name, booking number, and the amount to be released. Anyone can deposit money into an inmate trust account, but only the inmate can release money from their account by completing a property release slip and orally confirming the withdrawal with jail personnel.

## IV. Hutchinson's position in the Mexican Mafia

During the time period at issue in the trial, Hutchinson was an "upper echelon" member of the Mexican Mafia and a representative for Eulalio Martinez, the "chief executive officer of the Mexican Mafia among 40,000 inmates in Los Angeles" and the ranking member in the Los Angeles County jail.[2] After Hutchinson and Martinez were housed together in the jail in 2007, Hutchinson became Martinez's right hand man. During this time, there was a significant increase in the number of deposits and withdrawals from Hutchinson's inmate trust

---

[2] Martinez ceased control in the jail when he died in 2013.

account, including money withdrawn from Hutchinson's account and deposited into Martinez's inmate trust account, sometimes by the same person on the same date. The spike in activity after December 2007 placed Hutchinson's inmate trust account in the top .01 percent of all accounts for the quantity of deposits and withdrawals.

## V. Recorded conversations

At trial, several recordings of jailhouse conversations were played to the jury and interpreted by the People's experts.

In one recorded phone call, made on January 25, 2008, secretaria Jennifer Barela directed a Mexican Mafia representative to deposit money from the kitty into Hutchinson's inmate trust account.

Fourteen excerpts were played for the jury from a secretly recorded conversation which occurred on January 29, 2009, between Hutchinson, Martinez, and two other individuals in which they discussed transporting and selling drugs in the jail, collecting money, and putting individuals on hit lists. Martinez asked Hutchinson about missing drugs in the jail. Hutchinson said he would find the missing drugs and sell them, but Martinez told Hutchinson to send the drugs directly to him. They discussed a certain section of the jail and who had authority to sell drugs there. They also discussed problems relaying messages to secretarias during visitations and potential solutions to keep their conversations secret. Hutchinson and Martinez also discussed putting names on a hard candy list.

In another phone call, made on August 24, 2009, inmate Gabriel Ronquillo, who had decisionmaking authority from Martinez, called Lora Hernandez and Trinidad Gonzalez. Hernandez is a secretaria and Gonzalez is a Sureño. They

6

discussed debits and credits collected from street gangs and inmates. Gonzalez confirmed that he had documentation of "what came in and what's going out" and that he "kept it all documented right here." They also discussed how to get drugs into the jail and how their code talk was disorganized.

## VI. Additional evidence

On May 15, 2008, Brenda Zuniga visited Hutchinson and held a small handwritten note up to the plexiglass partition. Prison staff confiscated the note, which said, "What[']s the status on Victoria Park? Leave them as they are? Tell Chato to send any writing codes." The People's expert explained that Victoria Park is a street gang under the Mexican Mafia's control and Chato is Mexican Mafia member Alfred Ortega. The note asked whether the Victoria Park gang was still on a green light list. That same day, Zuniga withdrew $1,300 from Hutchinson's inmate trust account, and deposited $1,300 into Ortega's inmate trust account.

On June 19, 2008, Zuniga's sister visited Hutchinson. Hutchinson told her to read something, write down a number, and give her name to someone. Hutchinson wrote her name down to put on a "slip" and gave further instructions for what she should do after she receives the "slip." Later that day, she withdrew $1,900 from Hutchinson's inmate trust account.

Los Angeles County Sheriff's detectives later executed a search warrant for a post office box in Barela's name. They recovered receipts that corresponded with deposits to Hutchinson's inmate trust account. The receipts identified inmates who paid for drugs and contributed to the kitty.

7

## VII. Procedure

An amended grand jury indictment charged Hutchinson with conspiracy to bring controlled substances into jail (Pen. Code,[3] §§ 182, subd. (a)(1), 4573, subd. (a); count 1), conspiracy to commit extortion by threats (§§ 182, subd. (a)(1), 519, 520; count 2); conspiracy to commit money laundering (§§ 182, subd. (a)(1), 186.10, subd. (a); count 4); and five counts of conspiracy to commit murder (§§ 182, subd. (a)(1), 187, subd. (a); counts 11–15). It was further alleged that Hutchinson committed the crimes for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subds. (b)(1)(A) & (C)), and that he had a suffered a conviction for a serious or violent felony, pursuant to the "Three Strikes" law (§§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d)).

A jury found Hutchinson guilty of counts 1, 2, and 4 and found the gang allegations to be true. The jury was unable to reach a verdict on counts 11 through 15, and the trial court declared a mistrial as to those counts. Hutchinson admitted the prior strike allegation and the trial court sentenced him on count 2 to an indeterminate term of 19 years to life. On counts 1 and 4, the trial court sentenced him to a determinate term of 12 years four months.[4]

Hutchinson timely appealed.

---

[3] All further undesignated statutory references are to the Penal Code.

[4] Hutchinson's sentence was to run consecutively and be subordinate to his sentence of 21 years for manslaughter in a separate case.

## DISCUSSION

Hutchinson contends that the trial court had a duty to instruct the jury with CALJIC No. 17.05 or a similar instruction to determine whether he was part of multiple conspiracies or whether he was part of one conspiracy to commit multiple crimes.[5]  The People counter that the trial court did not have a sua sponte duty to instruct on the number of conspiracies and

---

[5] CALJIC No. 17.05 reads in relevant part:  "If you have found the defendant[s] guilty of more than one count of conspiracy, you must then determine whether there was one overall conspiracy to commit [multiple] [two] crimes, or whether there were separate conspiracies.  You should consider all of the applicable evidence and determine this issue.  [¶]  When a single agreement to commit one or more crimes is evidenced by an overt act, the precise nature and extent of the conspiracy must be determined by reference to the agreement which embraces and defines its objectives.  Whether the object of a single agreement is to commit one or many crimes, it is in either case the agreement which constitutes the crime.  One agreement cannot be taken to be several agreements and hence several conspiracies simply because it envisions committing more than one crime.  [¶] However if you find beyond a reasonable doubt that there was not one overall agreement, but separate agreements, each accompanied by an overt act, then separate conspiracies have been established.  [¶]  If you find the defendant[s] guilty of more than one count of conspiracy, you will then include a finding as to whether there is one overall conspiracy or separate and distinct conspiracies."

9

that Hutchinson forfeited this contention by not requesting the instruction.

## I.    Additional background

The trial court separately instructed the jury for each conspiracy count.

For count 1, the trial court instructed the jury in relevant part with CALCRIM No. 415, as follows: "The defendant may be guilty of a crime if he either commits the crime, or he may also be guilty if he is a member of a conspiracy. [¶] The defendant is charged in [c]ount 1 with conspiracy to commit the crime of [b]ringing [c]ontrolled [s]ubstances into a [j]ail . . . , in violation of . . . section 182. [¶] To prove that a defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant intended to agree and did agree with one or more of the other defendants or other unidentified co-conspirators to commit the crime of bringing controlled substances into a jail; [¶] 2. At the time of the agreement, the defendant and one or more of the other alleged members of the conspiracy intended that one or more of them would commit the crime of bringing controlled substances into a jail; [¶] 3. One of the members of the conspiracy, or any or all of them, committed at least one of the following alleged overt acts to accomplish bringing controlled substances into a jail: [¶] a. On or about December 14, 2007, Eulalio Martinez assumed control of a highly organized criminal enterprise that controls the collection of proceeds of illegal activity within the Los Angeles County [j]ail system. This organization is commonly referred to as the Southside and is controlled by the Mexican Mafia, a violent prison gang. [¶] b. Between December 14, 2007, and November 5, 2009, Eulalio Martinez, Joseph Hutchinson, and other unidentified co-

10

conspirators devised a plan to facilitate the ongoing smuggling of controlled substances into the Los Angeles County [j]ail system to benefit Eulalio Martinez through the collection of a third of all quantities of controlled substances smuggled.  [¶]  c.  On August 24, 2009, Gabriel Ronquillo discussed methods of bringing drugs into the Los Angeles County [j]ail with Trinidad Gonzalez; [¶]  AND  [¶]  4.  At least one of these overt acts was committed in California.  [¶]  To decide whether a defendant committed these overt acts, consider all of the evidence presented about the acts.  [¶]  To decide whether the defendant and one or more of the other alleged members of the conspiracy intended to commit the crime of bringing controlled substances into a jail, please refer to the separate instructions that I will give you on that crime.  [¶] The People must prove that the members of the alleged conspiracy had an agreement and intent to commit bringing controlled substances into a jail.  The People do not have to prove that any of the members of the alleged conspiracy actually met or came to a detailed or formal agreement to commit that crime.  An agreement may be inferred from conduct if you conclude that members of the alleged conspiracy acted with a common purpose to commit the crimes."

For count 2, the trial court instructed the jury in part: "The defendant is charged in Count 2 with conspiracy to commit the crime of [e]xtortion by [t]hreats . . . , in violation of . . . section 182.  [¶]  To prove that a defendant is guilty of this crime, the People must prove that:  [¶]  1.  The defendant intended to agree and did agree with one or more of the other defendants or other unidentified co-conspirators to commit [e]xtortion by [t]hreats; [¶]  2.  At the time of the agreement, the defendant and one or more of the other alleged members of the conspiracy intended

11

that one or more of them would commit [e]xtortion by [t]hreats; [¶] 3. One of the members of the conspiracy, or any or all of them, committed at least one of the following alleged overt acts to accomplish [e]xtortion by [t]hreats: [¶] a. On or about December 14, 2007, Eulalio Martinez assumed control of a highly organized criminal enterprise that controls the collection of proceeds of illegal activity within the Los Angeles County [j]ail system. This organization is commonly referred to as the Southside and is controlled by the Mexican Mafia, a violent prison gang. [¶] b. Between December 14, 2007, and November 5, 2009, Eulalio Martinez and co-conspirators devised a scheme to extort a percentage of all purchases from the jail store made by the Hispanic inmates within the Los Angeles County [j]ail [s]ystem, and to direct the proceeds to Eulalio Martinez. [¶] c. Between December 14, 2007, and November 9, 2009, numerous unidentified co-conspirators enforced the collection of items purchased from the Los Angeles County [j]ail [s]tore by Hispanic inmates in order to be placed in the [k]itty and sold for the benefit of Eulalio Martinez. The contribution of purchased items was enforced with violence and the threat of violence. [¶] d. Between August 11, 2007, and March 2008, Jennifer Barela maintained a post office box to accept the receipt of proof of payments made by Los Angeles County [j]ail inmates purchasing the [k]itty. [¶] e. Between August 11, 2007, and March 27, 2008, Jennifer Barela received proof of payments in her post office box. [¶] f. From January 2008, to June 2009, Joseph Hutchinson allowed his inmate trust account to be used to deposit money procured from the [k]itty. [¶] g. From August 14, 2008, to May 21, 2009, Brook Deras withdrew money procured from the [k]itty scheme from Joseph Hutchinson's inmate trust

12

account to transfer to the benefit of Eulalio Martinez.  [¶] h.  From April 30, 2009, to May 21, 2009, Brook Deras deposited money procured from the [k]itty scheme into Eulalio Martinez's inmate trust account.  [¶]  i.  Between December 14, 2007, and October 8, 2009, Trinidad Gonzalez accepted money procured from the [k]itty scheme.  [¶]  j.  Between December 14, 2007, and May 28, 2009, Trinidad Gonzalez deposited money procured from the [k]itty scheme into Eulalio Martinez's inmate trust account. [¶]  k.  On August 24, 2009, Trinidad Gonzalez gave Gabriel Ronquillo an accounting of proceeds gained from the [k]itty scheme;  [¶]  AND  [¶]  4.  At least one of these overt acts was committed in California."

For count 4, the trial court instructed the jury in part: "The defendant is charged in Count 4 with conspiracy to commit the crime of [m]oney [l]aundering . . . , in violation of . . . section 182.  [¶]  To prove that a defendant is guilty of this crime, the People must prove that:  [¶]  1.  The defendant intended to agree and did agree with one or more of the other defendants or other unidentified co-conspirators to commit [m]oney [l]aundering;  [¶] 2.  At the time of the agreement, the defendant and one or more of the other alleged members of the conspiracy intended that one or more of them would commit [m]oney [l]aundering;  [¶]  3. One of the members of the conspiracy, or any or all of them, committed at least one of the following alleged overt acts to accomplish [m]oney [l]aundering:  [¶]  a.  On or about December 14, 2007, Eulalio Martinez assumed control of a highly organized criminal enterprise that controls the collection of proceeds of illegal activity within the Los Angeles County [j]ail system.  This organization is commonly referred to as the Southside and is controlled by the Mexican Mafia, a violent prison gang.  [¶]

13

b. Between December 14, 2007, and November 5, 2009, Eulalio Martinez and co-conspirators devised a scheme to extort a percentage of all purchases from the jail store made by the Hispanic inmates within the Los Angeles County [j]ail [s]ystem, and to direct the proceeds to Eulalio Martinez. [¶] c. Between December 14, 2007, and November 9, 2009, numerous unidentified co-conspirators enforced the collection of items purchased from the Los Angeles County [j]ail [s]tore by Hispanic inmates in order to be placed in the [k]itty and sold for the benefit of Eulalio Martinez. The contribution of purchased items was enforced with violence and the threat of violence. [¶] d. Between August 11, 2007, and March 2008, Jennifer Barela maintained a post office box to accept the receipt of proof of payments made by Los Angeles County [j]ail inmates purchasing the [k]itty. [¶] e. Between August 11, 2007, and March 27, 2008, Jennifer Barela received proof of payments in her post office box. [¶] f. From January 2008, to June 2009, Joseph Hutchinson allowed his inmate trust account to be used to deposit money procured from the [k]itty. [¶] g. From August 14, 2008, to May 21, 2009, Brook Deras withdrew money procured from the [k]itty scheme from Joseph Hutchinson's inmate trust account to transfer to the benefit of Eulalio Martinez. [¶] h. From April 30, 2009, to May 21, 2009, Brook Deras deposited money procured from the [k]itty scheme into Eulalio Martinez's inmate trust account. [¶] i. Between December 14, 2007, and October 8, 2009, Trinidad Gonzalez accepted money procured from the [k]itty scheme. [¶] j. Between December 14, 2007, and May 28, 2009, Trinidad Gonzalez deposited money procured from the [k]itty scheme into Eulalio Martinez's inmate trust account. [¶] k. On March 5, 2009, David Nunez withdrew $5,000 from the

14

inmate trust account of Eulalio Martinez.  [¶]  l.  On August 24, 2009, Trinidad Gonzalez gave Gabriel Ronquillo an accounting of proceeds gained from the [k]itty scheme;  [¶]  AND  [¶]  4.  At least one of these overt acts was committed in California.

The trial court separately instructed the jury with CALJIC No. 7.34.06 [bringing controlled substances into jail], CALCRIM No. 1830 [extortion by threats], CALCRIM No. 2997 [money laundering] as to the elements of the target crime for each conspiracy.

The trial court also gave an unanimity instruction regarding overt acts.  The instruction read:  "As to [c]ount 1, [c]onspiracy to [b]ring [c]ontrolled [s]ubstances into a [j]ail, you may not find the defendant guilty of this count unless the jury makes a unanimous finding of the following overt act:  On August 24, 2009, Gabriel Ronquillo discussed methods of bringing drugs into the Los Angeles County [j]ail with Trinidad Gonzalez.  [¶]  As to [c]ount 2, [c]onspiracy to [c]ommit [e]xtortion by [t]hreats, if you find the defendant guilty you will be asked to make a finding as to whether the following overt act is true:  On August 24, 2009, Trinidad Gonzalez gave Gabriel Ronquillo an accounting of proceeds gained from the [k]itty scheme.  [¶]  To make such a finding, the jury must be unanimous.  Please refer to CALCRIM 415, generally, for what is required to prove this count.  [¶]  As to [c]ount 4, [c]onspiracy to [c]ommit [m]oney [l]aundering, you may not find the defendant guilty of this count unless the jury makes a unanimous finding of the following overt act:  On August 24, 2009, Trinidad Gonzalez gave Gabriel Ronquillo an accounting of proceeds gained from the [k]itty scheme."

15

## II.    Applicable law

### A.    *Conspiracy*

"A conspiracy exists where two or more people agree to commit a crime, they specifically intend both to agree and to commit the crime, and one of them performs an overt act in furtherance of their agreement." (*People v. Kopp* (2019) 38 Cal.App.5th 47, 83; §§ 182, subd. (a)(1), 184.)  "Conspiracy is an inchoate crime.  [Citation.]  It does not require the commission of the substantive offense that is the object of the conspiracy. [Citation.]  'As an inchoate crime, conspiracy fixes the point of legal intervention at [the time of] agreement to commit a crime.' " (*People v. Swain* (1996) 12 Cal.4th 593, 599–600.)

The crime of conspiracy is the agreement itself, not the number of victims or the number of statutes violated, i.e., the number of agreements determines the number of conspiracies. (*People v. Meneses* (2008) 165 Cal.App.4th 1648, 1669 (*Meneses*); *People v. Lopez* (1994) 21 Cal.App.4th 1551, 1557.)  Commission of separate crimes or separate acts in furtherance of a conspiracy is not inconsistent with a single overall agreement, which may include subgroups or subagreements.  (*People v. Vargas* (2001) 91 Cal.App.4th 506, 553–554.)  "The test is whether there was one overall agreement among the various parties to perform various functions in order to carry out the objectives of the conspiracy.  If so, there is but a single conspiracy." (*People v. Skelton* (1980) 109 Cal.App.3d 691, 718, disapproved on another ground in *People v. Figueroa* (1986) 41 Cal.3d 714, 731.) Relevant factors include whether the crimes involved the same motives, were to occur at the same time and place and by the same means, and targeted a single or multiple victims.  (*Meneses*, at p. 1672.)

16

**B.** *Duty to instruct*

The trial court must instruct the jury, sua sponte, on the general principles of law relevant to issues raised by the evidence. (*People v. Michaels* (2002) 28 Cal.4th 486, 529–530.)

The parties acknowledge a split in authority as to whether the determination of the number of conspiracies is a jury question and whether a trial court has a sua sponte duty to instruct on that issue. (*People v. Williams* (2015) 61 Cal.4th 1244; *Meneses*, *supra*, 165 Cal.App.4th at pp. 1668–1669.) Hutchinson asks us to follow the more recent line of cases that hold that the trial court must instruct the jury to determine whether one or multiple conspiracies existed when the evidence supports alternative findings. (*Meneses*, at pp. 1668, 1671; *People v. Jasso* (2006) 142 Cal.App.4th 1213, 1220 (*Jasso*); *People v. Vargas*, *supra*, 91 Cal.App.4th at p. 554.) The People ask us to follow *People v. Liu* (1996) 46 Cal.App.4th 1119, 1133 and *People v. McLead* (1990) 225 Cal.App.3d 906, 920–921, two older decisions that hold otherwise.

*Jasso*, *supra*, 142 Cal.App.4th 1213, involved several drug smuggling attempts into a prison. The defendant made numerous phone calls to his contact, giving the contact the names and phone numbers of several inmates' wives, who planned to visit their husbands in prison. The contact then procured the drugs, packaged them according to the defendant's instructions, and gave the packages to the wives for them to conceal inside their bodies for delivery at their next visit. On three different days over the span of three consecutive months, three women visiting their husbands were searched and found to be carrying drugs. (*Id*. at pp. 1216–1219.) The defendant was convicted of three counts of conspiracy to transport a controlled substance

17

into prison.  (*Id*. at p. 1215.)  The *Jasso* court rejected the Attorney General's attempt to portray each attempt as necessarily being separate conspiracies, stating, "The Attorney General sees many trees but not the forest."  (*Id*. at p. 1222.)  The court concluded the jury could have found that there was one single agreement, and the trial court erred in failing to instruct on single versus multiple conspiracies.  (*Id*. at p. 1223.)

We do not find *Liu* and *McLead* persuasive in light of *Jasso* and the more recent case law.  *Liu* and *McLead* involved multiple conspiracies to murder different individuals.  *Meneses*, *supra*, 165 Cal.App.4th at pages 1670 and 1671, explained why relying on *Liu* and *McLead* is problematic in cases that involve the issue of single versus multiple conspiracies as each case relied on *People v. Davis* (1989) 211 Cal.App.3d 317, which concerned solicitation of murder, not conspiracy.  *Meneses*, at page 1670, recognized that the problem with extending reasoning applicable to solicitation of murder to the issue of multiple conspiracies "is that the number of victims is not a firm basis or indicator for determining the number of conspiracies.  It is the agreement, not the overt acts that defines the crime."  While solicitation to murder is also not defined by the number of victims, but by the number of solicitations, it is unlike conspiracy because "a multiplicity of victims in solicitation to murder cases often reveals a multiplicity of objectives."  (*Id*. at p. 1671.)  However, a coconspirator set "to commit separate criminal acts is not necessarily engaged in multiple conspiracies; a single conspiracy may have as its object one or many crimes."  (*Ibid*.)

*Meneses*, *supra*, 165 Cal.App.4th at page 1671, expressly followed *Jasso*, *supra*, 142 Cal.App.4th 1213, in holding that a trial court is required to instruct the jury to determine whether a

18

single conspiracy or multiple conspiracies exist when there is evidence to support alternative findings. We find *Meneses*'s discussion of *Liu* and *McLead* persuasive, and thus follow the more recent line of authority that requires the trial court to instruct the jury to determine whether a single conspiracy or multiple conspiracies existed when there is evidence to support alternative findings. (*Meneses*, at p. 1668; accord *Jasso*, at p. 1220; *People v. Kopp, supra*, 38 Cal.App.5th at pp. 84–85.)

### III. The trial court failed to instruct the jury to determine whether there was one overall conspiracy to commit multiple crimes as an alternative to finding multiple separate conspiracies.

Here, as in *Jasso*, the evidence supports an alternative finding that Hutchinson was involved in a single conspiracy to commit multiple crimes. The evidence shows that the Mexican Mafia is a highly organized criminal enterprise, whose primary objectives are to make money and to establish its authority within the jail by enforcing its rules through violence. Each of the Mexican Mafia's schemes had overlapping motives, means, and involved similar dates and individuals. The drug sales, the kitty, and the green light and hard candy lists were a means to generate revenue under threat of violence. The green light and hard candy lists provided the means of enforcement to ensure inmates made the required payments. The money laundering, which occurred in the same manner regardless of the source of the money, allowed the Mexican Mafia to access its ill-gotten gains generated from each scheme. Thus, each conspiracy could be viewed as overlapping and supporting the other. Further, the jury instructions show that each conspiracy was based on the same acts by the same individuals. The overt act that tied each

19

of the conspiracy counts together was the August 24, 2009 conversation between members of the Mexican Mafia's hierarchy where they discussed bringing drugs into the jail and an accounting of monies received from street gangs and inmates.  As the prosecutor acknowledged during his closing argument, the separate conspiracies went "hand in hand" and were "intertwined."  "It's kind of hard to separate them from one another.  [¶]  So you can't really extort inmates of their property without having a way to bring the money in.  And the way to bring it into the jails is through the inmate trust accounts.  And so all of these conspiracies to extort money, to take a third of the drugs, to launder the money, they all kind of go together."

*People v. Vargas*, *supra*, 91 Cal.App.4th 506 and *People v. Skelton*, *supra*, 109 Cal.App.3d 691 are instructive.  In *Vargas*, at pages 517 to 518, the defendant was charged with and convicted of one count of conspiracy to commit murder, robbery, assault with a deadly weapon, arson, burglary, extortion, intimidation of witnesses, terrorist threats, escape, possession of a concealable firearm by a convicted felon, and distribution of drugs.  The defendant was a member of the Nuestra Familia.  (*Id*. at p. 523; see *People v. Prunty* (2015) 62 Cal.4th 59, 69.)  The evidence showed that the Nuestra Familia maintained a hit list, sold drugs, extorted drug dealers, and that defendant had planned and ordered the murders of individuals who had gone against the gang. (*Vargas*, at pp. 520–529.)  The defendant argued that the trial court should have instructed the jury to determine if one or multiple conspiracies existed.  (*Id*. at p. 549.)  The appellate court affirmed, concluding that the evidence showed one overarching conspiracy—an agreement to establish Nuestra Familia as a criminal gang to commit murder, robbery, burglary, extortion,

and drug trafficking among other crimes. (*Id.* at p. 553.) "Within that umbrella conspiracy were subconspiracies to commit specific crimes. However, the commission of the specific crimes, and the drawing up of plans . . . to commit them, were all in pursuance of the overriding purpose of the [Nuestra Familia], which was to establish power through the use of crime, force, and fear, and to use that power to further strengthen and perpetuate itself by killing its enemies, raising money for the gang, and instilling obedience and discipline among its members by killing members who break its rules." (*Ibid.*)

In *People v. Skelton, supra*, 109 Cal.App.3d at pages 700 and 702, a jury convicted three defendants each of one count of conspiracy for their participation in a pyramid investment scheme that involved fraudulent programs broadly divisible into dairy and land investment. The defendants argued that the trial court should have instructed the jury on whether there were one or two conspiracies based on the dairy and land programs. (*Id.* at p. 717.) The appellate court affirmed, concluding that the evidence showed only one overall scheme. (*Id.* at p. 718.) It found that each investment program operated under the umbrella of a parent company and that the money was disbursed to and flowed through each program as needed. (*Ibid.*) Further, while the coconspirators performed different functions, their activities overlapped within the different investment programs, thus the jury was properly instructed on a theory of one overall conspiracy. (*Ibid.*)

Like *Vargas* and *Skelton*, there is sufficient evidence in the present case that Hutchinson's conduct fell under the umbrella of one agreement to support the Mexican Mafia in its efforts to exert control over the jail and to make money through extorting

21

inmates.  The People's experts described the Mexican Mafia as a business which has as its number one objective to make money and that everything that it does flows from that objective.  Each scheme could be properly characterized as a step to achieve that overarching goal.  Moreover, there is no evidence to show that a Mexican Mafia member, or anyone within its hierarchy could selectively choose which scheme to participate in.  Rather, the evidence shows that there is a common agreement about the rules requiring inmates to participate in the Mexican Mafia's drug and kitty schemes and enforcement of those rules via hit lists.  While there may have been multiple subagreements, a jury could find that they each fit into a broader agreement to support the Mexican Mafia as a criminal enterprise within the jail.

The People argue that Hutchinson's characterization of one overall conspiracy is overbroad and that the case is more akin to *Meneses*, *supra*, 165 Cal.App.4th 1648.  In *Meneses*, the defendants were convicted of multiple counts of conspiracy based on a scheme to defraud insurance companies by encouraging accident victims to obtain legal and medical services even when none were needed.  (*Id.* at pp. 1651, 1659.)  The defendant was a " 'capper' " (one who solicits business for lawyers) and would purchase stolen police reports to get the contact information of accident victims.  (*Id.* at 1654.)  He then referred the victims to different lawyers and chiropractors who paid the defendant a referral fee.  (*Id.* at pp. 1652–1653.)

After concluding that the trial court had a duty to instruct the jury to determine whether there was one or multiple conspiracies, the appellate court concluded that the evidence did not support a finding of a single overarching conspiracy.  (*Meneses*, *supra*, 165 Cal.App.4th at p. 1671.)  The court found

22

that each conspiracy was distinct and disconnected because they involved different conspirators at different times. (*Id.* at p. 1672.) Although the defendant was the common denominator in each scheme, each conspiracy involved other coconspirators. (*Ibid.*) Even for those conspiracies that involved only the defendant and the clerk who stole the police reports, the court found that they did not have a "a single, uninterrupted agreement" because the clerk would stop providing the reports at times and then start providing them again. (*Ibid.*)

Unlike *Meneses*, here, there was evidence that Hutchinson was part of an ongoing scheme to make money for a highly organized criminal enterprise with a set of rules and a clear hierarchy. Each scheme involved the same individuals fulfilling their respective roles within that hierarchy and overarching criminal conspiracy. There was no evidence that Hutchinson acted independently. Further, a jury could find that there was no evidence to show that the various schemes stopped and started making each conspiracy distinct and disconnected.

Thus, we conclude the evidence supports an alternative finding that Hutchinson was engaged in one conspiracy to commit multiple crimes. Accordingly, the trial court had a sua sponte duty to instruct on the issue of single versus multiple conspiracies.[6]

---

[6] Hutchinson notes that the prosecutor mentioned to the trial court that, on instructions pertinent to the case, CALJIC included topics that the CALCRIM do not. As we have previously noted, the trial court used CALCRIM to instruct the jury on the conspiracy counts. As noted above, CALJIC No. 17.05 addresses the issue of whether one or several conspiracies exist. However, there is no corresponding instruction in CALCRIM. We further

## IV.    The error was prejudicial.

The People contend that even if the trial court's failure to instruct on a single overall conspiracy was error, the error was harmless.  We disagree.

We will not reverse a conviction for instructional error unless "an examination of 'the entire cause, including the evidence,' discloses that the error produced a 'miscarriage of justice.' " (*People v. Breverman* (1998) 19 Cal.4th 142, 149.)  The defendant must show that it is reasonably probable that he would have achieved a more favorable result absent the error.  (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

The People argue that any instructional error was harmless because the principle of a single conspiracy versus multiple conspiracies was conveyed by the given instructions.  However, nothing in the instructions told the jury that, if it found the existence of multiple conspiracies, it must determine whether there was one overall conspiracy to commit multiple crimes.  Without that instruction, if the jury believed that there was one overall agreement, it could not find that only one conspiracy existed.  Given the evidence that the purpose of bringing drugs into the jail and the movement of money from the kitty and drug sales through inmate trust accounts were parts of a single, overriding agreement to make money for the Mexican Mafia through extortion, it is reasonably probable that a properly

---

note that the CALCRIM bench notes do not mention the sua sponte duty to instruct on this issue, but the CALJIC use notes do.  The sua sponte duty is mentioned in section 2.37 of the 2022 CJER Mandatory Jury Instructions Handbook.  The Advisory Committee on Criminal Jury Instructions may wish to consider adding an instruction on this issue to CALCRIM.

24

instructed jury would have convicted Hutchinson of a single conspiracy rather than three.[7] (*Jasso*, *supra*, 142 Cal.App.4th at p. 1223.)

We requested supplemental briefing to clarify the proposed disposition, in the event that this court were to find instructional error. The People argue that a finding of instructional error should result in a reversal of all counts. Hutchinson claims that the evidence established there was only one conspiracy and requests that we strike only the convictions in counts 1 and 4.[8] Our conclusion, consistent with *Jasso*, is that "the jury should have been directed to decide the factual issue that would have been posed by the omitted instruction." (*Jasso*, *supra*, 142 Cal.App.4th at p. 1223.)

Accordingly, we agree with the People, and we reverse the convictions in counts 1, 2, and 4 and remand the matter with directions. On remand the People shall have the opportunity to either retry counts 1, 2 and 4, and the attached gang enhancements in accordance with Assembly Bill No. 333, or accept the jury's conviction on one of the three substantive

---

[7] Given our conclusion that the error was prejudicial under California's harmless error standard, we need not address Hutchinson's claim that the error violated his federal constitutional rights to due process and a fair trial, which would trigger the more stringent standard established in *Chapman v. California* (1967) 386 U.S. 18.

[8] In Hutchinson's opening brief, he requested that we reverse counts 1 and 4, but in his reply brief, he requested that we reverse all three convictions. In supplemental briefing, Hutchinson apologized for the confusion and clarified that his request is that we reverse counts 1 and 4.

counts, after which the remaining counts and allegations shall be dismissed.

As previously noted, the jury found the gang enhancements to be true on counts 1, 2 and 4.  However, Assembly Bill No. 333 (2021–2022 Reg. Sess.), which took effect on January 1, 2022, made significant amendments to the gang statute, section 186.22. The parties agree, as do we, that Hutchinson is entitled to the ameliorative benefits of the amendments to section 186.22, and that the amendments apply retroactively where, as here, the defendant's conviction was not final when the amendments took effect.  (See *People v. Lopez* (2021) 73 Cal.App.5th 327, 343–344.) If the People elect to retry Hutchinson on the gang enhancements, the People will have the opportunity to establish the new elements in accordance with Assembly Bill No. 333.

## DISPOSITION

The judgment is reversed and remanded with directions to the trial court to give the People the opportunity to retry counts 1, 2 and 4 and the attached gang allegations. If the People elect not to retry those counts and the gang allegations, then the trial court shall resentence Joseph Hutchinson on one count, after which the remaining counts shall be dismissed.

NOT TO BE PUBLISHED.


KIM, J.[*]


We concur:


EDMON, P. J.


LAVIN, J.

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.